# SUMMARY APPRAISAL REPORT
## Before and After Property Damage

**Of**
Dr. Richard C. Adler Property
Located at 525 Solomon Ln.
Of the Meadows Subdivision
Hindman, Kentucky



**For**
Joe F. Childers & Associates
201 West Short Street, Suite 300
Lexington, Kentucky 40507
Attn: Joe F. Childers

**Appraised By**
Kentucky Field Service Realty, Inc.
Vance Mosley, KY Lic. No.  0832 CA-G
Coby W. Mosley Associate Appraiser KY Cert. No. 04286 /Forester
PO Box 921 Hyden, Kentucky 41749
(606) 672-3856

# Kentucky Field Service Realty, Inc.

Vance Mosley, CA-G # 0832
Coby W. Mosley, Associate Appraiser/Forester
PO Box 921
Hyden, KY 41749
(606) 672-3856

March 11, 2013
Joe F. Childers & Associates
201 West Short Street, Suite 300
Lexington, Kentucky 40507
Attn: Joe F. Childers

Re:  Damage Appraisal
     525 Solomon Ln.
     of Meadow View Subdivision
     Hindman, Kentucky

Dear Mr. Childers:

In accordance with your request, I have made a summary appraisal report before and after property damages of 525 Solomon Lane, of the Meadows Subdivision Hindman, Kentucky containing 0.5 acres more or less, and a 1 story single-family residence. The fee simple property rights are appraised.

The purpose of the appraisal is to estimate the "as is" market value of the subject property before and after property damages for litigation purposes to determine a diminution in value. The intended use of this assignment is to assist the client with decision making for litigation purposes. I have used information obtained from my inspection and information provided by the client and/or landowner in my decision making process. Market data such as comparable sales and neighborhood data was derived from a variety of public and private sources. No extra ordinary assumptions were used in this appraisal report. A hypothetical condition is used for the condition of the property in the before condition as if the property is free and clear of any property damages. The appraisal problem is to assist the client in determination of the marketability and diminution in value. After considering the expert opinions in both consultant reports the appraiser has determined that the property is un-marketable.

It is concluded that the estimated market value of the subject property as of March 11, 2013 in the before condition is shown below and in the after condition as of March 11, 2013 and is as follows:

Cost Approach
   1. Value Estimate Before Damages=         $270,000
   2. Value Estimate After Damages=         $0
   3. Difference=         $270,000
Sales Comparison Approach
   1. Value Estimate Before Damages=         $250,000
   2. Value Estimate After Damages=         $0
   3. Differences         $250,000

After considering all approaches used given most weight to the sales comparison approach the damage estimate is $250,000.

If you have any questions, please feel free to contact me.

Sincerely,

_____
Vance Mosley
KY Certified General Appraiser #0832

# Table of Contents

Title Page……………………………………………………….. 1
Letter of Transmittal.................................................................... 2
Certificate of Value…………………………………………….. 4

**Part I – Premises of Appraisal**
Summary of Fact and Conclusions.............................................. 5
References.................................................................................... 5
General Assumptions and Limiting Conditions.......................... 5
Photographs of Subject Property……………………………….. 6-14
Environmental Disclaimer........................................................... 15
Verification of Inspection............................................................ 15
Purpose of the Appraisal and Intended Use and Users………….. 15
Definition of Value and Date of Value Opinion………………… 15
Property Rights Appraised……………………………………… 15
Scope of Work………………………………………………….. 16

**Part II – Presentation of Data**
Identification of the Property, Legal Description..................................... 16
Personal Property or Non-realty Property................................................ 16
History of Property................................................................................... 17
Market area, City, Neighborhood and Location Data............................... 17
Property Description and Property Data……..................................... 17-19

**Part III – Analysis of Data and Conclusions-Before Damages**
Definition of Highest and Best Use.......................................................... 19
Highest and Best Use Analysis................................................................. 19-20
Conclusion of Highest and Best Use......................................................... 20
Appraisal Approaches Used....................................................................... 20
Cost Approach............................................................................................ 20-21
Sales Comparison Approach…………………………………………… 22-28
Income Capitalization approach…………………………………………. 29
Reconciliation- Before Damages………………………………………… 29

**Part IV- Analysis After Damages**
Analysis & Damage Description…………………………………………. 29-31
Estimate of Value After Damages……………………………………… 31
Reconciliation- After Damages………………………………………… 31
Estimate of Exposure Time…................................................................ 31

ADDENDA
LOCATION MAP
FLOOR PLAN
ENGENEERING CONSULTANT REPORT
RAMJACK COST ESTIMATE FOR PIERS
DEED
APPRAISER'S QUALIFICATION

# Certificate of Value

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analysis, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analysis, opinions, and conclusions
3. I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.
4. I have not completed services on this property within the past 3 years.
5. My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report.
6. My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the 'Uniform Standards of Professional Appraisal Practice.' *2012-2013 Edition*.
7. I have made a personal inspection of the appraised property which is the subject of this report and all comparable sales used in developing the estimate of value. The date of inspection was March 11, 2013, the date of the report was March 11, 2013 and the method of inspection was physical.
8. Associate appraiser Coby Mosley provided significant professional assistance to the person signing this report.
9. The landowner representative did accompany the appraiser the date of inspection which was March 11,2013.
10. It is concluded that the estimated market value of the subject property as of March 11, 2013 in the before condition is shown below and in the after condition as of March 11, 2013 and is as follows:

Cost Approach

| | | |
|---|---|---|
| 4. | Value Estimate Before Damages= | $270,000 |
| 5. | Value Estimate After Damages= | $0 |
| 6. | Difference= | $270,000 |

Sales Comparison Approach

| | | |
|---|---|---|
| 4. | Value Estimate Before Damages= | $250,000 |
| 5. | Value Estimate After Damages= | $0 |
| 6. | Differences | $250,000 |

After considering all approaches used given most weight to the sales comparison approach the damage estimate is $250,000.

Sincerely,

_____

Vance Mosley
KY Certified General Appraiser #0832

By_____
Coby Mosley
Associate Real Property Appraiser KY Cert. No. 04286/ Forester

# PART I-PREMISES OF THE APPRAISAL

## Summary of Facts and Conclusions

| | | |
|---|---|---|
| 1. | Owner of Record | Dr. Richard C. Adler |
| 2. | Acreage | 0.5 acres, more or less |
| 3. | Highest and Best Use | Residential |
| 4. | Improvements | 2,252 Sq ft.1 Story single-family Home, 622 sqft 2-Car Garage 337 sqft. Covered porches |
| 5. | Date of Inspection: | March 12, 2013 |
| 6. | Report date: | March 12, 2013 |
| 7. | Value of Appraised Property: | |

**Cost Approach**

| | |
|---|---|
| Value Estimate Before Damages= | $270,000 |
| Value Estimate After Damages= | $0 |
| Difference= | $270,000 |

**Sales Comparison Approach**

| | |
|---|---|
| Value Estimate Before Damages= | $250,000 |
| Value Estimate After Damages= | $0 |
| Differences | $250,000 |

| | |
|---|---|
| **Diminution in Value** | $ 250,000 |

| | | |
|---|---|---|
| 8. | Hypothetical Condition: | The property is free and clear of any damages. |
| 9. | Extraordinary Assumptions: | None used |

### References

1. The landowner Dr. Richard Adler
2. CSI (Consulting Services Incorporated of Kentucky) Engineering Report
3. Inspector USA, Inc. Michael D. Green home inspector, inspectors report
4. Tonya Callahan- Mortgage lender Hyden Citizens Bank
5. Ryan Osborne- State Farm Insurance Agent
6. Public records of Knott and Perry County, Kentucky.

### General Assumptions and Limiting Conditions

This appraisal is made subject to the following assumptions and limiting conditions:

1. That title is assumed to be merchantable and marketable
2. That no responsibility is assumed by the appraiser for legal matters especially those affecting title to the property.
3. That the legal description furnished the appraiser is correct
4. That certain opinions, estimates, or other data furnished the appraiser by others are correct.
5. The property has been surveyed on the property and the acreage is taken from Tax maps, and the landowner.
6. The appraiser reserves the right to alter his opinion value on the basis of information that would not be uncovered during the normal course of investigation.
7. The appraisal is to be used as a whole and not in part.

**Photographs of The Subject property**



**Rear view of subject property**
Pictures By: Coby Mosley on 03/11/2013



**Street view of subject property**
Pictures By: Coby Mosley on 03/11/2013



**Interior view of 2-car garage**
Pictures By: Coby Mosley on 03/11/2013



**Kitchen**
Pictures By: Coby Mosley on 03/11/2013



**Living room**
Pictures By: Coby Mosley on 03/11/2013



**½ bathroom**
Pictures By: Coby Mosley on 03/11/2013



**Bathroom**
Pictures By: Coby Mosley on 03/11/2013





**Master bedroom**
Pictures By: Coby Mosley on 03/11/2013



**Bedroom**
Pictures By: Coby Mosley on 03/11/2013

**Photographs of observed property damages are as follows:**


Crack in concrete in garage


Crack through brick


Stair step crack in brick above window


Stair step crack in brick.


Crack through brick


Crack in brick under back porch



Floor joiced not sitting on concrete block



Window damage  as mentioned in the inspector's report



Crack in grout in bathroom



Crack in grout in bathroom



New crack in ceiling not noted in engineers
 or inspectors report



View of crack in drywall



Separation in hardwood floor and Trim. Floor makes unusual sound when you walk on it.



Crack on ceiling in living room not noted on engineers



Crack on living room ceiling  not noted on engineer or Inspectors report.



Crack in ceiling not noted on noted on engineers or Inspectors report.



Crack in trim around windows



Crack in ceiling  not noted on engineers report or Inspectors report.



Crack between trim and drywall.



Uneven doors



Crack in trim below window



Separation in hardwood floor (makes screech when walk on it).

## Environmental Disclaimer.

The value estimated is based on the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions. The appraisers' routine inspection of and inquires about the subject property did not develop any information that indicated any apparent significant hazardous substances or detrimental environmental conditions which would affect the property negatively unless otherwise stated in this report. It is possible that tests and inspections made by a qualified hazardous substance and environmental expert would reveal the existence of hazardous substances or detrimental environmental conditions on or around the property that would negatively affect its value.

## Verification of Inspection

This is to certify that the appraiser did personally inspect the subject property on March 11, 2013 and was accompanied by the landowner representative.

## Purpose and Intended Use and Users of the Appraisal

The purpose of this appraisal is to estimate the market value of 0.5 acres, more or less with improvements before damages using a hypothetical condition that the property is free and clear of any damages and estimate the market value after damages (condition as of the effective date of appraisal) the difference will result in the diminution in value due to the damages observed.

*Intended Use:* The intended use of this appraisal is to assist the client in decision making for litigation purposes due to alleged subsidence.

*Intended user*s: The intended users of this report are Joe F. Childers and the courts of Kentucky.

## Definition of Value and Date of Opinion of Value

Market Value is defined as the amount in cash, or on terms reasonable equivalent to cash, for which, in all probability, the property would be sold by a knowledgeable owner, willing, but not obligated, to sell to a knowledgeable purchaser who desires, but is not obligated to buy. *USPAP 2012-2013 Edition.* The date of opinion of value is the same as the effective date and inspection date which is January 28, 2013

## Property Rights Appraised

The property rights appraised consists of the fee simple ownership of 0.5 acres of land more or less (See attached deed addenda).

## Summary of Appraisal Problem

The appraisal problem is to estimate the market value before and after property damage to determine a diminution in value of the subject property and assist the client with decision making purposes. The before condition will be determined by use of a hypothetical condition as if the property is free and clear of damages.

## Scope of Work

The scope of the appraisal requires compliance with the Uniform Standards of Professional Appraisal Practice *2012- 2013 Edition* promulgated by the Appraisal Standards Boards of the Appraisal Foundation and the guide notes to the Standards of Professional Appraisal Practice adopted by the Appraisal Institute. The standards contain binding requirements and specific guidelines that deal with the procedures to be followed in developing an appraisal, analysis, or opinion. The uniform standards set the requirements to communicate to appraiser's analysis, opinions and conclusions in a manner that will be meaningful and not misleading in the market place.

Attorney Joe F. Childers has requested the appraiser to estimate the market value of the subject property before and after property damage to determine an estimate of diminution in value. The intended use of the appraisal is for litigation purposes. Sales will be used that are similar to the subject and the best sales available will be used. A narrative appraisal report on the subject property has been prepared. The subject property data, including the size, location, quantity has been considered, if applicable and included in this report. Market data including sales were analyzed and presented. The data assembled has been utilized to consider the Highest and Best Use of the subject property and to arrive at an estimate of value.

The appraiser lacks the knowledge and experience with respect to the detection and measurement of hazardous substances which may affect the property. The value in the before condition will be determined by use of a hypothetical condition that the property is free and clear of damages and comparable sales will be used that are free of such damages to determine the before value of the subject property. The value in the after condition is based on the marketability of the subject property. In cases were a property is burdened by damages or potential future damages the property may not be marketable or not mortgageable.

Kentucky Appraiser Coby W. Mosley, KY Cert. No. 04286 assisted with (check all that apply- put N/A in ones which are Not Applicable): __X__ Development of the site description and analysis, __X__ development of building description and analysis, __X__ development of Highest and Best Use, __X__ collection, verification, and analysis of data, ___N/A___ development of Sales Comparison Approach, ___X___ development of Cost Analysis, ___N/A____ Development of Income Analysis, ___X___ final reconciliation, ___X___ reporting of subject report, __N/A__ (list any other completed functions). Associate Appraiser agrees with Limiting Conditions and Certification of this report. This statement is intended to be an extension of the subject report's Certification and Limiting Condition Statement.

# PART II-PRESENTATION OF DATA

## Identification of The Property, Legal Description

The property is located at 525 Solomon Lane, at the Meadow Subdivision, Hindman, Kentucky in Knott County, Kentucky containing 0.5 acres more or less. (See attached deed for legal description). The improvements consist of a 2,252 sqft. 1-story single-family residence with a 622 sqft 2-car garage and 40.8 sqft. covered porch in the front of the house and a 296.4 sqft. Covered porch in the rear of the house.

## Personal Property or Other Non-real property

Only the real property is appraised.

## History of The Property
The subject property has been used as a single-family home since it was built in 2011. The Meadow Subdivision has been a residential development for approximately 6 years. Prior to the development of the subdivision the property was used as a surface mine area in the late 1990s.

## Sales History of the Subject Property
The last sale of the subject occurred November 30, 2010 for a sale price of $36,000 between Elk Glen LLC of P.O. Box 1722, Hindman, Kentucky 41822 to Dr. Richard C. Adler located in Deed Book 255 page. 636-638 and was a vacant lot only.

## Market  Area, City,  Neighborhood and Location Data
As of the census of 2000, there were 17,649 people, 6,717 households, and 4,990 families residing in the county. The population density was 50 per square mile (19 /km$^2$). There were 7,579 housing units at an average density of 22 per square mile (8.5 /km$^2$).

There were 6,717 households out of which 34.40% had children under the age of 18 living with them, 57.60% were married couples living together, 12.60% had a female householder with no husband present, and 25.70% were non-families. 23.60% of all households were made up of individuals and 9.30% had someone living alone who was 65 years of age or older. The average household size was 2.54 and the average family size was 3.00.

In the county the population was spread out with 24.50% under the age of 18, 10.80% from 18 to 24, 29.00% from 25 to 44, 24.30% from 45 to 64, and 11.40% who were 65 years of age or older. The median age was 36 years. For every 100 females there were 97.30 males. For every 100 females age 18 and over, there were 94.10 males.

The median income for a household in the county was $20,373, and the median income for a family was $24,930. Males had a median income of $29,471 versus $21,240 for females. The per capita income for the county was $11,297. About 26.20% of families and 31.10% of the population were below the poverty line, including 39.80% of those under age 18 and 23.10% of those age 65 or over.

## Land Description
The property is a 0.5 acre residential lot located on the edge of a steep slope in the Meadow subdivision.

## Improvements
The improvements consist of a 2,252 sqt ft 1 story single-family residence  with a 622.2 sqft 2-car garage, a 40.2 sqft. Covered porch in the front of the house and a 296.4 sqft covered porch in the rear of the the house all built in 2011. Public utilities consist of city water and electric there is also a septic tank on the property. Overall the improvements are considered in good condition or C2 quality rating and the quality of construction is considered a Q3 condition rating in the before condition. A description of the condition and quality rating are as follows:

C2
The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction. (Uniform Appraisal Database Protocol UAD).

Q3
Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

## Improvement description
2,252 sq. ft. one-story single family residence, 622.2 sq ft. 2-car garage, a 40.8 sqft covered porch in front of house and 296.4 sqft. Covered porch in rear of house built in 2011.

Porch/Patio/Deck: One covered porch
Exterior: Brick
Roof: Shingle
Foundation: Concrete block
Gutter/downspouts: Aluminum
Bathrooms: Granite countertops, marble floors and drywall walls
Kitchen: Hardwood floors-Maple, maple cabinets, granite countertops and stainless steel appliances.
Living room: Hardwood floor-maple

## Taxes and Assessment Data
The Kentucky Constitution requires the state to tax all classes of taxable property, and state statues allow local jurisdictions to tax only a few classes. All locally taxed property is subject to county taxes and school district taxes (either a county school district or an independent school district). Property located inside the city limits may also be subject to city property taxes. Property assessments in Kentucky are 100% fair cash value.
Accounts receivable are taxed at 85% of face value. Special local taxing jurisdictions (fire protection districts, watershed districts, and sanitation districts) levy taxes within their operating areas (usually a small portion of community or county). The most current tax rate is 7.45 per/thousand. The 2013 rate has not been set. For Knott Co. Ky, therefore the rate of 2012 will be used.

### County Tax Rate
The tax rate for Knott County for the year 2012 is per $1,000.00 assessment based upon 100% fair cash value. The property is accessed at $336,000 for property map 026-00-00-062.00 and the total tax amount for the 2012 tax year. (8.10 X 336 = $2,721.6)

## Zoning
None

## Flood plain
The property is not located within a flood plain

## Deed Restrictions
None observed

## Access
The property can be accessed by paved Solomon lane in the meadows subdivision.

## Outstanding Rights
None known

## Archeological Sites
None observed by the appraiser.

## Mineral Rights (Mineral Description)
Mineral rights included.

## Vegetation/Timber
Not applicable.

# PART III – ANALYSIS OF DATA AND CONCLUSIONS

## Definition of Highest and Best Use
That reasonable probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability. *Page 22 of The Appraisal of Real Estate Twelfth Edition.*

## Highest and Best Use Analysis
It is physically possible to use this tract as a residential property as it is financially feasible as tracts of this type is being used as commercial multi-family.

- **Site as though vacant analysis**

    1. <u>Legally Permissible</u>: It is legally permissible to use the property as a residential property as there are no restrictions that would inhibit this use.

    2. <u>Physically Possible</u>: It is physically possible to use the property as a residential property on the usable land as there are no physical barriers to inhibit the use as such.

    3. <u>Financially Feasible</u>: It is financially feasible as there is nothing that will affect the use of the tract to its highest and best use on a financial basis.

4. Maximally Productive: The maximally productive use is what will bring the highest value on the open market and is considered residential use.

- **Property as improved analysis**
    1. Legally Permissible: It is legally permissible to use the property as a residential property as there are no restrictions that would inhibit this use.

    2. Physically Possible: It is physically possible to use the property as a residential property as there are no physical barriers to inhibit the use as such.

    3. Financially Feasible: It is financially feasible as there is nothing that will affect the use of the tract to its highest and best use on a financial basis.

    4. Maximally Productive: The maximally productive use is what will bring the highest value on the open market and is considered residential use.

## Highest and Best Use Conclusion

Based upon the current use of this property, topography, and uses of similar properties in the area of the subject, the Highest and Best Use of the subject is for residential use.

## Appraisal Approaches Used

In the process of doing this appraisal, all of the three approaches to value were considered. The Cost Approach, which relies on cost information, will be considered due to the property having improvements. The sales comparison approach will be used which relies upon comparable sales that have sold within the market area of the subject with similar improvements. The income capitalization approach which relies on an income stream or potential income stream will not be used due to the lack of an income stream or potential for an income stream on the subject property.

## Cost Approach

When considering the Cost Approach to value, the appraiser has considered sales of similar properties in the area, which accurately reflect the trends of the local market as to values of properties similar to the subject. In the cost approach the appraiser determines the bare land value by use of vacant land sales that are similar to the subject property. The replacement value of the improvements is determined by use of cost hand books, comparable sales or local cost estimates and then the improvements are depreciated based on physical, functional or external obsolescent.

Depreciation was estimated from the age/life method of which the effective age (age based on condition) of the house is divided by the total economic life to equal the percent depreciation.

## Land Valuation

Based on comparable sales in the market area of the subject property the estimated market value of the 0.5 acres of land on the subject property is $36,000. Estimate of value by the Cost approach and analysis is on following page.

**<u>Estimate Cost of Improvements</u>**

**Cost estimates based on Marshall and Swift Residential Cost Handbook**

**Cost Estimate – One Story Masonry Good quality of construction**

Marshall and Swift Cost handbook, Page Good-15

**One Story Brick Residence** -Square Footage (Area) x Cost/Sq. Ft = Cost New

Average Class S

2,252 sqft x $100.34 = $225,966

**Garages- Masonry page good- 24**

2-Car Garage  622.2 sqft. x $33.29 = $20,713

**Porch/Breezeways- Page good-23**

2 covered porches 337.2 sqft.  $30.53 =$10,295

Total Cost New = $256,974

Physical Depreciation = (Age/Life) 2/55 = 4%

Functional Deprecation= 0%

External Depreciation= 0%

Depreciated cost of improvements= $246,695

Lot Value $36,000

Total Value by Cost Approach= $282,695

Estimated value by the Cost Approach call **$283,000**

**Cost estimate based on conversation with Dr. Richard Adler.**

Contract Amount: $236,250

Additional payments: $7,120

Total Cost new of Improvements: $243,370

Physical Depreciation = (Age/Life) 2/55 = 4%

Functional Deprecation= 0%

External Depreciation= 0%

Depreciated cost of improvements= $233,635

Lot value = $36,000

Total Value by Cost Approach= **$269,635**

**Based on both estimates used the value indicated by the Cost Approach is $270,000.**

## Estimate of Value by the Sales Comparison Approach

Qualitative/Quantitative Analysis

A qualitative analysis is analyses were adjustments are made to the comparable sales based on whether the sale is superior, inferior or similar to the subject property also called a relative comparison analysis. A quantitative analysis is adjustments made to comparable sales using numerical data or dollar adjustment and will be used in this appraisal report.

Six comparable sales are used to compare to the subject property in the before condition as indicated in the sales analysis grid. In the before condition the property will be appraised with an effective date of March 11, 2013 using a hypothetical condition that the property is not adversely affected and fee and clear of any damages as are the comparable sales. In the after condition the appraiser will determine the effects of the damages and potential future damages and how it will affect the marketability to determine a diminution in value.

*See sales analysis grid on following page*

# Sales Analysis Grid

| | Subject | Sale #1 | Sale #2 | Sale #3 | Sale #4 | Sale #5 | Sale #6 |
|---|---|---|---|---|---|---|---|
| **Location (Address)** | 252 Solomon Lane Hindman, KY | 170 St. Barts Dr. Hazard, KY 41701 | 180 Sandy lee Dr. Hindman, KY, 41822 | 136 Falcon Crest Hazard, KY 41701 | 896 Phoenix Place Blvd. Hazard, KY 41701 | 66 St. Barts Rd. Hazard, KY 41701 | 66 St. Barts Rd. Hazard, KY 41701 |
| **Sale Price** | N/A | $269,000 | $285,000 | $280,000 | $221,000 | $210,000 | $215,000 |
| **Date of Sale** | N/A | 07/11 | 02/12 | 11/12 | 10/12 | 05/11 | 03/09 |
| **Property Rights Conveyed** | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | Similar | Similar |
| **Financing** | N/A | Conventional | Conventional | Conventional | Conventional | Conventional | Conventional |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | Similar | Similar |
| *Condition of Sale* | N/A | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| *Adjustment* | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Expenditures made immediately after purchase** | N/A | None | None | None | None | None | None |
| *Adjustment* | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Market Conditions** | N/A | Equal | Equal | Equal | Equal | Equal | Equal |
| *Adjustments* | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Site** | 0.50 acres | 0.57 acres | 0.50 acres | 0.18 acres | 0.97 acres | 0.54 acres | 0.50 acres |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | Similar | Similar |
| **View** | Residential | Residential | Residential | Residential | Residential | Residential | Residential |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | Similar | Similar |
| **Design (Style)** | 1 Story | 2 Story | 1.5 Story | 2 Story | 1 Story | 1.5 Story | 1 Story |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | Similar | Similar |
| **Quality of Construction** | Q3 Good | Q3 Good | Q3 Good | Q3 Good | Q3 Good | Q3 Good | Q3 Good |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | Similar | Similar |
| **Actual/Effective age** | 2/2 | 4/4 | 3/3 | 5/5 | 6/6 | 8/8 | 2/2 |
| *Adjustment* | N/A | +8,600 | +4,600 | +13,500 | +13,800 | +19,400 | Similar |
| **Condition** | C2 | C2 | C2 | C2 | C3 | C3 | C2 |
| *Adjustment* | N/A | Similar | Similar | Similar | Inferior | inferior | inferior |
| **Room count** | 8 total 3 bed 2 ½ bath | 8 total 3 bed 3 bath | 8 total 3 bed 3 bath | 8 total 4 bed 3.5 bath | 8 total 3 bed 2 bath | 8 total 3 bed 2 bath | 8 total 3 bed 2 bath |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | Similar | Similar |
| **Gross living area** | 2,252 | 3,072 | 2,800 | 2,941 | 2,363 | 1,636 | 740 |
| *Adjustment* | N/A | -12,300 | -8,200 | -10,335 | 0 | +9,200 | +22,680 |
| **Basement/Finished Rooms Below Grade** | None | None | None | None | None | None | None |
| *Adjustment* | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Functional Utility** | Typical | Typical | Typical | Typical | Typical | Typical | Typical |
| *Adjustment* | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Heating and Cooling** | EHP/CAC | EHP/CAC | EHP/CAC Gas fireplace | EHP/CAC | EHP/CAC | EHP/CAC | EHP/CAC |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | Similar | Similar |
| **Energy efficient Items** | Typical | Typical | Typical | Typical | Typical | Typical | Typical |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | Similar | Similar |
| **Garage/carport** | 2-Car Garage | 2-Car Garage 1-Car Built in garage | 1-Car Garage 1-Car Detached garage | 2-Car Garage | 2-Car Garage | None | 2 Car garage |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | +25,500 | Similar |
| **Porch/Deck/Patio** | Cov. porch | Cov. porch | Cov. porch | Stoop-Deck | Porch-Deck | Porch | Porch |
| *Adjustment* | N/A | Similar | Similar | Similar | Similar | Similar | Similar |
| **Adjusted value** | N/a | $277,600 | $289,600 | $293,500 | $234,800 | $264,100 | $237,680 |

**Sale #1**



**Sale #2**



**Sale #3**



**Sale #4**



**Sale #5**



**Sale #6**



# Justification of Adjustments (Sales Discussion)

**Condition/effective age**: Adjustments for condition was derived from the age/life method of each sale to determine the depreciation compared to the subject property. ***Example***: Sale 4 has an effective age of 8 typical life expectancy of 55 and the subject has an effective age of 2 typical life expectancy of 55 with a difference of 6 years. So 6/55 = a 11% adjustment for condition/effective age.

**GLA adjustment:** This adjustment was derived from pairing sale 4 with sale number 6 which was similar in all aspects except GLA and indicated a $15/sqft adjustment due to differences in square footage and was used to adjust each sale for GLA to the subject.

**2 Car Garage Adjustment:** This adjustment was derived by pairing sale number 2 that had a 1 car detached garage and a 1 car attached garage to sale number 4 that had no garage. After all adjustments were made leaving only the garages as being different the sales indicated a difference of $51,000 for both garages divided by 2 or a plus $25,500 adjustment for the garage.

C**3 Rating (Sales 4 and 5)**
The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained. (Uniform Appraisal Database Protocol UAD).

Sale #1
Occurred on 01/11for a sale price of $269,000 or $87.6/sqft and contained 0.57 acres. The property consists of a 3,072 sqft GLA. 2-story brick/vinyl siding house with a 400 sqft 2 car attached garage and a 1car built in garage and is inferior to the subject for the built in garage. The improvements were built in 2009 with good quality of construction rating (Q3) and in good condition rating (C2). This sale is located within 5 mile of the subject in the Phoenix Place Subdivision and is similar in location as the subject. Sale has access to city water, septic and electric utilities.  An adjustment of plus $8,600 was made to the sale for difference in effective age/condition. An adjustment of minus 12,300 was made for differences in GLA.   Overall sale is similar to the subject in all aspects except GLA  and effective age/condition and indicates and adjusted value of $277,600

Sale #2
Occurred on 02/12 for a sale price of $285,000 or $101.79/sqft and contained 0.50 acres. The property consists of a 2,800 sqft GLA. 2-story brick house with a 400 sqft 1 car attached garage, a 1 car detached garage. The sale also has a gas fireplace. The property also has a brick detached garage which is superior to the subject for this factor. The sale was built in 2010 with good quality of construction rating (Q3) and in good condition rating (C2). This sale is located within 1 mile of the subject in  the Hunter Forest Subdivision and is similar in location as the subject. Sale has access to city water, septic and electric utilities. An adjustment was made for difference in condition/effective age of plus $4,600 and an adjustment was made of minus 8,200 for GLA. Overall sale is similar to the subject in all aspects except GLA and effective age/condition and indicates and adjusted value of $289,600.

Sale #3
Occurred on 11/12 for a sale price of $280,000 or $95.3/sqft and contained 0.18 acres. The property consists of a 2,941 sqft GLA. 2-story brick/vynil siding house with a 2 car attached garage and is similar to the subject for this factor. The improvements were built in 2008 with good quality of construction rating (Q3) and in good condition rating (C2). This sale is located within 5 mile of the subject in the Phoenix Place Subdivision and is similar in location as the subject. Sale has access to city water, septic and electric utilities. An adjustment was made for difference in condition/effective age of plus $13,500 and an adjustment was made of minus $10,335 for GLA. Overall sale is similar to the subject in all aspects except GLA and effective age/condition and indicates and adjusted value of $293,500.

Sale #4
Occurred on 10/12 for a sale price of $221,000 or $93.5/sqft and contained 0.97 acres but is considered similar to the subject as it was purchased as a lot. The property consists of a 2,363 sqft GLA which is similar to the subject do to size. 1-story brick house with a 2 car garage and is similar to the subject for this factor. The sale was built in 2007 with good quality of construction rating (Q3) and in good condition rating (C3). This sale is located within 5 miles of the subject in the phoenix Place subdivision and is similar in location as the subject. Sale has access to city water, septic and electric utilities. An adjustment was made for difference in condition/effective age of plus $19,400. Overall sale is similar to the subject in all aspects except effective age/condition and indicates and adjusted value of $234,800.

Sale #5
Occurred on 05/11 for a sale price of $210,000 or $128.4/sqft and contained 0.54 acres. The property consists of a 1,636 sqft GLA. 1.5-story house with vinyl siding. The property has no garage and is inferior to the subject for this factor. The sale was built in 2005 with good quality of construction rating (Q3) and in good condition rating (C3). This sale is located within 5 miles of the subject in the phoenix Place subdivision and is similar in location as the subject. Sale has access to city water, septic and electric utilities. An adjustment was made for difference in condition/effective age of plus $13,500 and an adjustment was made of minus $10,335 for GLA. Overall sale is similar to the subject in all aspects except GLA , effective age/condition and 2 car garage indicating an adjustment of plus $25,500 indicating and adjusted value of $264,100.

Sale #6
Occurred on 03/09 for a sale price of $215,000 and contained 0.50 acres. The property consists of a 740 sqft GLA. 1-story brick house. The property has a 2 car garage and is similar to the subject for this factor. The sale was built in 2007 with good quality of construction rating (Q3) and in good condition rating (C2). This sale is the only sale found in the same subdivision that is similar to the subject and is located approximately 50 yards from the subject. Sale has access to city water, septic and electric utilities. An adjustment was made for difference in GLA of plus $22,680. Overall sale is similar to the subject in all aspects except GLA indicating an adjusted value of $237,680.

After considering all 6 sales in the sales comparison approach with most weight given to sales 4, 5 and 6. The estimated market value of the subject property in the before condition is $250,000.

## Income Capitalization Approach

The income approach will not be considered as the subject property is not an income producing property and properties of this type usually do not rent in the market area.

## Recompilation- Before Damages

Value estimates by each approach to value is as follows:

Cost Approach:                          $270,000
Sales Comparison Approach:      $250,000
Income Capitalization Approach:    N/A

# PART IV-ANALYSIS AFTER DAMAGES

## Analysis and Damage Description
**(See "Subject Photo" section of addenda for visual representation of damages)**

**Engineers Report Description**

The property is appraised before damages occurred and after damages to the property to determine the diminution in value cause by the alleged damages.

An engineering report provided by CSI (consulting Services Incorporated of Kentucky) is used for the determination of the marketability and extent of stigmatization of the subject property.

- The engineer report has stated that the fill material from previous mining activity could be 30 to 40 feet thick and 10 to 15 years old and made up of isolated settlement areas and not widespread. They also state that the water flow through the areas washing the fine materials away and causes voids which would collapse overtime. Movement can last many years and the settlement could be several inches thick. They state any structure constructed on uncontrolled fill such as the site is at risk of structurally significant settlement and by use of deep foundations or piers  tied into the bedrock will eliminate this risk (see page 6 paragraph 4 of engineers report).
- They also mention that the adjacent slope located 10 to 20 feet from the house is moderately steep and mentions that there could be a risk for the adjacent slope to become unstable after the placement of the piers. If the slope exceeds 2 to 3 inches then the piers would likely fail. (see page 6 paragraph 5 of engineers report).

**RamJack cost to cure estimate for installing Piers and Pilings ( RamJack estimate sheet)**

Installation of 58 piers

Cost to cure: $63,800.00

This estimate does not include cost to cure cracks and other damages. Due to the future possibility of the risk of movement of the underlying soil, rock and debris a situation is created were a cost to cure estimate cannot be estimated.

**Property Inspectors Report Description (observation list)**

- **Exterior Cracks in Brick:** According to the home inspector the cracks observed in the brick of the house is common occurrence in homes after a few years but is unusual in home of this age. The inspector states that it is a strong likelihood that the problem will worsen in the future. Below is a list of problems observed by the property inspector.
- **Failed Thermoseals:** The inspector observed fogging windows and determined that the seals have failed and determined that the normal cost to replace the glass panes are $200-$300 per pane and $400 to $800 per glass door.
- **Support post in attic improperly installed**
- **Foundation concrete blocks laid unevenly**
- **Evidence of large amount of movement throughout the house**
- **Cracked/Separation ceiling and/or walls throughout house including master bathroom indicates signs of movement.**
- **Unlevel floors and separation of floor to wall and shower unit in master bath were observed indicates signs of movement.**
- **Abnormally squeaky floor located in office and kitchen indicates signs of movement.**
- **Damaged windows or door(s) trim, indicates signs of movement.**
- **Door to laundry room and a closet door in bedroom left side of house, center does not close properly indicates signs of movement.**
- **Misaligned Door indicating movement of structure,**
- **Misaligned window observed in laundry room, the window would not open, indicates signs of movement.**
- **Inspector observed conditions on deck, porch or stoop that are considered unsafe.**
- **Property history shows that property is a reclaimed strip mine. There is evidence that ground could be unstable.**

*The bullet points above are the main highlights of the inspectors report and derived.*

Note: The appraiser observed several cracks on the ceiling corners in several places in the living room area that was not mentioned by the home inspector and occurred after the home inspectors inspection. Cracks were also observed in the full bathroom in the corners of the marble floors that were not mentioned by the home inspector.

**Lender and Insurance Agent Opinion**
According to Tonya Callahan, mortgage lender with Hyden Citizens Bank stated that a property like the subject would not be mortgageable due to the risk factors involved due to the current and potential future conditions of the property. According the Ryan Osborne with State farm Insurance the property would currently be uninsurable due to the problems and potential future risks associate with the property.

**Overall observation**

Based on current Kentucky law under 201 KAR section 1(4) 11:121 the owner of record is required by statute to disclose fully the damages of the property before putting it on the market for sale subjecting the owner to fraud if these issues are not disclosed. The disclosure of the damages and potential future damages would make the property unmarketable, undesirable, uninsurable and not mortgagable due to the potential future risk factors and problems with the property. After reviewing the engineers report and home inspectors report the appraiser has determined that the property is not marketable as of the effective date of value due to the aforementioned conclusions.

The engineers report has stated that to fix the problem piers should be tied to the bedrock with an estimated cost of $63,800 for 58 piers. They also state that there is a risk that the slope could be unstable and fail resulting in the failure of these piers. This would be considered a significant risk to a typical buyer in the market place resulting in the property being undesirable/unmarketable, uninsurable and mortgagable to the market participants.

## Reconciliation

After considering all the aforementioned sales, market data obtained during the appraiser inspection, expert opinions and observations of damages to the subject property. The appraiser has concluded that the property is unmarketable, uninsurable and not mortgageable. The estimate of value and diminution in value estimate is demonstrated as follows:

**Cost Approach**
7. Value Estimate Before Damages=    $270,000
8. Value Estimate After Damages=     $0
9. Difference=                       $270,000

**Sales Comparison Approach**
7. Value Estimate Before Damages=    $250,000
8. Value Estimate After Damages=     $0
9. Differences                       $250,000

**After considering all approaches used given most weight to the sales comparison approach the diminution in value estimate is $250,000.**

## Estimate of Exposure Time

The estimated exposure time for commercial properties in the market area is 6 to 12 months. Exposure time is considered the time prior the effective date of the appraisal that it would take the subject property to sell on the effective date of value.

# ADDENDA

# Location Map



# Floor Plan

**FLOORPLAN SKETCH**

| | |
|---|---|
| Borrower: N/A | File No.: knott-Adler sales |
| Property Address: | Case No.: |
| City: | State: | Zip: |
| Lender: | |

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 2251.9750 | 2251.9750 |
| GAR | Garage | 622.2000 | 622.2000 |
| P/P | Porch | 40.8000 | |
| | Porch | 296.4000 | 337.2000 |
| Net LIVABLE Area | | (rounded) | 2252 |

| LIVING AREA BREAKDOWN | |
|---|---|
| Breakdown | Subtotals |
| First Floor | |
| 65.3000  x 28.1000 | 1834.9300 |
| 2.8900  x 48.3000 | 139.5870 |
| 5.5000  x 31.0000 | 170.5000 |
| 5.1100  x 14.2000 | 72.5620 |
| 1.1100  x 15.6000 | 17.3160 |
| 2.8000  x  6.1000 | 17.0800 |
| 6 Items          (rounded) | 2252 |

# Engineering Consultant Report



# Consulting Services Incorporated of Kentucky

135 West Short Street, Lexington, Kentucky 40507

October 4, 2011

Dr. Richard Adler
Sent via email: adler.richardmd@gmail.com

Subject:        Engineering Observations and Opinions Letter
Property at 525 Solomon Lane
Emelana, Kentucky
CSI Project Number 1710

Dear Dr. Adler:

**Consulting Services Incorporated of Kentucky (CSI)** appreciates the opportunity to provide our services to you and your property. This letter is being issued to discuss our findings and observations and opinions for conditions at your residence. Mr. Joe Cooke, PE, of our office met with you at your residence on September 13, 2011 to observe the conditions at the site and discuss project information.

### Project Information and Site Observations

The residence is located at 525 Solomon Lane at the Meadows Subdivision in Emelana (Knott County), Kentucky. We understand the house structure has been experiencing some cracking in the recent few months. The development itself, which includes many houses, roads and several houses currently being constructed, is located overlying previously contoured mined land. Below are photos of the general view of the outside of the residence as well as an up-to-date aerial from Google Maps.



Photo 1: General Photo of Front of Residence
(facing north-northeast)



Photo 2: Google Maps image of site location
(site shown in circle)

The residence is single story with wood stud walls framing, shallow spread footing foundations and a crawl space floor. A concrete driveway is located on the north side of the property and extends from Solomon Lane to the garage. The lot is relatively level from front to back with the exception of a moderately steep-downward slope beginning at about 10 to 20 feet from the rear of the house. At the time of our site visit, grass nor landscaping were installed. You informed us that the foundations for the

*Adler Residence, Emelana, Kentucky*
*CSI Project Number 1710*

house were constructed in December 2010 to January 2011 and the brick was installed in March of 2011 and you moved in the house in April of 2011. Additional general site pictures are shown below.



Photo 3: Photo of Driveway (facing east)



Photo 4: Photo of front of site (facing south)



Photo 5: Photo of site showing sloping areas (facing south)



Photo 6: Photo of slope from the toe of the slope (facing southwest)

We observed cracking brick at several locations around the house. These included locations at all sides and most of cracking was typical stair step type cracks, typical of some level of foundation movement. No cracking was observed on the inside walls. One crack was observed on the garage slab floor, but it appeared to be associated with shrinkage cracking in the concrete and not related to subgrade movements. Below are some photos of examples of the cracking brick.



Photo 7: Example Stair Step Cracking



Photo 8: Closeup of Photo 7





Photo 9: Example Brick Cracking



Photo 10: Closeup of Photo 9



Photo 11: Example Brick Cracking

Since the time of our site visit, you have informed us that several windows have "popped" and their seals have been broken. These are typically indications of some level of wall and/or foundation movement.

The observed site soils and surface materials are composed of mostly light colored brownish clay and silt with some gravel and cobbles. We observed a pile of cobbles and boulders which you have stated were taken from the excavation of the house foundations. It has been our experience that the observed materials are typical of similar sites. Below are some photos of the site surface conditions and the pile of boulders.

 

Photo 12: Example surface soils

Photo 13: Pile of boulders from foundation excavations

### Published Data Reviewed

The site was formerly a mountain top that was mined/removed by previous strip-mining activities in the past few decades. We reviewed aerial photography back to 1995.

 

Site Aerial Images, left-March 14 1995 and right-August 8, 2008, both from terraserver.com
(approximate site location shown in ovals)

According the USGS Carrie Geologic Map, dated 1965, the site is underlain by the Breathitt Formation. This portion of the Breathitt is comprised of materials between the Hindman Coal Bed and "Hazard Coal Zone", encompassing materials in and around the Hazard No. 7 Coal Seam. Specifically, these are mapped as sandstone, shale and siltstone with some coal. The sandstone portions make up over half of the bedrock and are usually light gray and medium grained. The shale and siltstones are generally darker gray in color and usually non-durable. Very thin soil overburden is common in the geology. Coal

seams are from about 2 to 5 feet in thickness, with some isolated areas as thick as 7 to 8 feet. Historically, the thicker seams were mined very early in the settlement of the region. Below are images of the site topographic and geologic mapping.



Images of the USGS Topographic Mapping, left and the Geologic Mapping, right
Both images are from the USGS Carrie Quadrangle. The site location is shown in the oval.

Based on the mine maps we reviewed the mining activities discontinued during the late 1990's. Specifically, the permitted mining included contour (strip) mining of the Hazard No. 7 and adjacent seams. Despite the increase requirements for hollow fill construction and reclaiming the mined areas, the law at the time (nor presently) requires the mining contractor to place the spoils as "engineered fill". However, the permit requirement would have required complete removal of underlying trees and would not allow burn pits or other mass burial of waste and deleterious materials, including coal slurry ponds. Also, some level of mine works inspection and filling would have been performed by coal mining governmental officials. Below are some images of the mine mapping.



Plan Views of Mine Permits in the Area (site location shown in ovals)

<u>Summary of Conditions and Risks</u>
The property is underlain by previously placed fill materials, likely consisting of mostly mine spoil fill from the contour mining operations during the past few decades. Fills of this type are usually placed in a loose, uncontrolled manner with minimal compactive effort applied. As a result, the fill can tend to move/ settle excessively over a period of time. The movement is usually related to total depth, material type and age of the fill mass. The fill at this site is of somewhat known thickness/depth and age, but the material type can only be assumed based on our experience, limited site observations and the geologic mapping reviewed. We have assumed the fill is mostly a mixture of soil, sand, gravel, cobbles and boulders. These materials are likely derived from interbedded sandstone, shale and siltstone with minimal original soil overburden content.

The fill is likely over 10-15 years old and is likely less than 30-40 feet thick. Typically, the majority of the movement of "older" fill masses of this depth/thickness is usually related to differential or isolated settlement areas and not widespread overall site movement/settlement. This is derived from areas of the fill that have less compaction, which allows water to flow through the areas, washing the fine materials with it. This is called "soil piping". The areas then contain voids which, over time, will collapse, creating movement in the overlying soils. These areas likely have continued movement until either the water flow in the loose zones stops or all/most of the fine materials are gone. It has been our experience that the movement can last for many years and the amount of settlement could be several inches or more.

There is no readily available way to measure the exact risk/potential of this movement. However, you property appears to have experience some level of movement already. That being the case, it is our opinion that your property is of a higher risk for future movement than adjacent or nearby properties.

It should be noted that any structure bearing on uncontrolled fills such as the site is at risk of potential structurally significant settlement and that only by bearing completely on controlled new fill (the entire fill mass) or using deep foundations (piers or similar) on bedrock will eliminate this risk.

Another risk that should be considered, is possible movement of the adjacent slope. The slope surface appears to be currently stable, but construction at or near such slopes can experience additional movement is the slope becomes unstable due to the aforementioned non-engineered fill.

<u>Repair Discussion</u>
Underpinning: This would consist of piers/piling installed down to the underlying bedrock to eliminate future risks of movement of the underlying old fill. The perimeter footings of the house are a relatively straight-forward process. Pier/pilings usually consist of either steel drilled/pushed piers, concrete drilled piers or auger-cast piles (similar to drilled piers) and these are installed down to bedrock and "pinned" to the footings. Below are some images that show the most common means of underpinning foundations.

  

Images of example underpinning systems for foundations

In recent years, we have observed that the underpinning of only the outside of the footings can yield another problem—foundation torsion. This process comes from underpinning the outside of the footing and the footing then "twisting" afterward because of the eccentric loading due to only underpinning the outside edge of the footing. To address this problem the interior of the footing should be underpinned at select locations. Also, the house is on a crawl space, which would indicate interior pier footings are present. These too would require underpinning. The installation of interior piers/piles is much more complex due to the limited access and disturbance of both your livelihood and the more delicate portions of the house.

As an alternative, a combination pier/pile system with some level of injection grouting/foam type materials may be prudent to use to minimize the requirement of interior drilling. The grouting/foam is injected on a pattern below the house, which can act as a "cement" to the underlying materials and often fill or at least partially fill the largest voids. The process also usually requires less piling because it addresses some of the issues at hand. However, the process cannot eliminate the need for some level of piling and could be more expensive than piers alone. Below is a figure that shows the combination of pier underpinning with the "injection" type process.



Figure showing an example combination pier underpinning and injection grouting

Slope Stability Note: We mentioned that another possible risk could include some movement related to the nearby slope becoming unstable due to the uncontrolled fill in the slope. If the slope becomes unstable and causes the house footprint area to begin to move, the underpinning for the house will not keep the house from moving horizontally and if the movement horizontally exceeds about 2 to 3 inches, the piers would likely fail. Repair considerations of such a slope failure are beyond our current scope of services.

In conclusion, it should be noted that this report does not present details for designing remediation features, nor should it be used as such. The scope of services provided is intended to present our finding, known project information and repair options according to our proposed services agreed upon by

you. If you have any other needs or any questions regarding the matters addressed in this letter, please do not hesitate to contact us at your convenience.

Sincerely,
**CSI of Kentucky**

Joseph S. Cooke, PE
Principal Engineer
Licensed Kentucky 21244

# RamJack Cost Estimate For Piers

**FOUNDATION:** Poured concrete □  B□ S□ CS□  Concrete Block □  B□ S□ CS□  Stone - Cut □ Rubble □  B□ S□ CS□

**CONSTRUCTION:**
1st Story-Brick Veneer ☑  Full Masonary □  Frame □  Concrete Block □
2nd Story-Brick Veneer □  Full Masonary □  Frame □  Concrete Block □
3rd Story-Brick Veneer □  Full Masonary □  Frame □  Concrete Block □

**ROOF:** Comp ☑  Tile □  Slate □  Wood □  Tar & Gravel □
**TERRAIN CORRECTION:** Contour □  Downspouts □  Lift-No □ Yes □



* Install 58 Ram Jack piers to load bearing strata
* Lifetime warranty (transferable)
* Price quoted to 20ft depth per pier additional footage would be 20$ per foot

Garage

Porch

Crawl space

Porch

63,700 ⁰⁰

Contract submitted to: Dr Richard Adler
Phone: (606) 785-4470
Date: 9-1-11
Job Location: 525 Solomon Lane Emmalena Ky 41740

Sketch not to scale (1 square=approximately 1 foot)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE DIVISION**

**Civil Action No. 12-85-ART**

RICHARD C. ADLER, M.D.                                    **PLAINTIFF**

V.                              **FIRST AMENDED COMPLAINT**

**ELK GLENN, LLC., a Kentucky**
**Limited Liability Company**

**AND**

**RICKY ROBINSON CONSTRUCTION, INC., a**
**Kentucky Corporation**                                 **DEFENDANTS**

*****************************************************************************

Richard C. Adler, M.D. (hereinafter "Dr. Adler"), for his First Amended Complaint

against the Defendants, Elk Glenn, LLC (hereinafter "Elk Glenn") and Ricky Robinson

Construction, Inc. (hereinafter "Robinson"), respectfully states as follows:

## INTRODUCTION

1. This Complaint, by Dr. Adler, is for compensatory and punitive damages and is filed

    pursuant to the Court's diversity jurisdiction. The Complaint seeks damages in

    excess of $75,000 from the Defendants, Elk Glenn and Robinson related to the sale

    of a lot and construction of a residence in the Meadow Subdivision in Knott County,

    Kentucky.

## JURISDICTION AND VENUE

Paragraph 1 of the Complaint is incorporated by reference herein as if fully set out.

1

2. There presently exists an actual controversy as Dr. Adler alleges that the Defendants breached two separate agreements, committed fraud in the inducement, were unjustly enriched, were negligent and grossly negligent, violated the provisions of the Kentucky Residential Building Code and KRS Chapter 198B, and breached the implied warranty of habitability. The obligations of Elk Glenn arose pursuant to an Agreement, the terms of which were memorialized in a Deed (the "Deed") between Dr. Adler and Elk Glenn for the sale of a lot in the Meadow Subdivision (the "Lot"). The Deed is attached hereto as **Exhibit A**. By separate Agreement (the "Construction Contract") either verbal or in writing, between Dr. Adler and Robinson, Robinson agreed to construct a residence (the "Home") on the Lot.

3. Dr. Adler seeks compensatory and punitive damages against both Elk Glenn and Robinson based on breach of contract, fraud and deceit, unjust enrichment, and negligence and gross negligence.

4. The amount in controversy between the parties exceeds Seventy-Five Thousand Dollars ($75,000.00).

5. Jurisdiction for this action is founded on diversity of citizenship pursuant to the provisions of 28 U.S.C. Section 1332.

6. Dr. Adler is a citizen of and is domiciled in the state of Ohio.

7. Elk Glenn is a Kentucky limited liability company whose sole member is Thacker-Grigsby Telephone Company, Inc., which is a Kentucky corporation with its principal place of business in Hindman, Kentucky.

8. Venue is proper in this District and this Division pursuant to 28 U.S.C. Section 1391, in that the principal places of business of Elk Glenn is in Knott County, Kentucky

2

and the principal place of business of Robinson is in Floyd County, Kentucky. The contracts allegedly breached by the Defendants were made and entered into in Knott County, Kentucky.

## THE PARTIES

Paragraphs 1 through 8 of the Complaint are incorporated by reference herein as if fully set out.

9. The Plaintiff, Dr. Adler, is a resident and citizen of the state of Ohio, domiciled and residing at 6389 Gem Stone Drive, Liberty Township, Ohio 45044.

10. The Defendant, Elk Glenn, is a Kentucky limited liability company whose sole member is Thacker-Grigsby Telephone Company, Inc., itself a Kentucky corporation with its principal place of business in Hindman, Kentukcy. Elk Glenn's principal place of business is located at 60 Communications Lane, Hindman, Kentucky 41822.

11. The Defendant, Robinson, is a Kentucky corporation whose principal place of business is located at 2070 Abbott Lane, Prestonsburg, Kentucky 41653.

## PERTINENT BACKGROUND FACTS

Paragraphs 1 through 11 of the Complaint are incorporated by reference herein as if fully set out.

12. Dr. Adler was formerly a resident of the state of New York who moved to eastern Kentucky in 2009 for the purpose of practicing medicine in aid to low income residents of Leslie and surrounding counties as an employee of Frontier Nursing Healthcare, Inc. in Leslie County, Kentucky.

13. Being unable to locate suitable permanent housing, Dr. Adler explored possible building sites and after finding two potentially suitable sites, settled on a relatively

3

new subdivision in Knott County, Kentucky, just off Highway 80, known as the Meadow Subdivision.

14. On or about November, 2010, Dr. Adler entered into a verbal contract with the owner of the Meadow Subdivision, Defendant Elk Glenn, for the purchase of Lot No. 20 in the Meadow Subdivision.

15. By deed dated November 30, 2010, Elk Glenn conveyed Lot No. 20 in the Meadow Subdivision to Dr. Adler for a purchase price of $36,000. The deed was recorded December 7, 2010.  See Exhibit A.

16. The Meadow Subdivision was developed by Elk Glenn on property which had formerly been surface mined and which had been "reclaimed" in the 1990's.

17. Elk Glenn caused to be filed in the Knott County Clerk's Office a plat of the Meadow Subdivision, filed at Plat Book 3, Page 69.

18. At the time he purchased the Lot from Elk Glenn, Dr. Adler's intention, as expressed to the duly authorized representatives of Elk Glenn, was to build a home on the Lot in which to reside.

19. Dr. Adler inquired of the duly authorized representatives of Elk Glenn if the Lot he was about to purchase was suitable for the construction of a house since the property had formerly been surface mined.

20. The duly authorized representatives of Elk Glenn assured Dr. Adler that the lot in question, Lot No. 20, was a solid and stable mountain top and suitable for the construction of a home.

21. The duly authorized representatives of Elk Glenn neither explained to Dr. Adler nor provided Dr. Adler with any information about the risks of building on a former

surface mine. The duly authorized representatives of Elk Glenn likewise did not inform Dr. Adler that he should seek the services of a structural or geotechnical engineer before purchasing the lot and constructing a home.

22. After giving Dr. Adler assurances about the suitability of Lot 20 for building a home, duly authorized representatives of Elk Glenn referred Dr. Adler to Robinson and held him out to be a reputable builder to build a house on the Lot. Robinson thereafter presented Dr. Adler with an Agreement on November 28, 2010, signed by Ricky Robinson, to build the home on Lot 20 of the Meadow Subdivision. See Exhibit B.

23. Dr. Adler agreed to the contractual terms proposed by Robinson, which called for all work to be carried out in accordance with applicable codes and regulations, and for total payments to Robinson of $236,250.

24. Dr. Adler inquired of the duly authorized representatives of Robinson, including Ricky Robinson, if the Lot he was about to purchase was suitable for the construction of a house since the property had formerly been surface mined.

25. The duly authorized representatives of Robinson, including Ricky Robinson, assured Dr. Adler that the lot in question, Lot No. 20, was a solid and stable mountain top and suitable for the construction of a home.

26. The duly authorized representatives of Robinson, including Ricky Robinson, neither explained to Dr. Adler nor provided Dr. Adler with any information about the risks of building on a former surface mine. The duly authorized representatives of Robinson, including Ricky Robinson, likewise did not inform Dr. Adler that he

should seek the services of a structural or geotechnical engineer before purchasing the lot and constructing a home.

27. Based on the assurances given to him by the duly authorized representatives of Robinson, including Ricky Robinson, Dr. Adler proceeded to hire Robinson to build a house on the Lot in accordance with the Agreement dated November 28, 2010.

28. In approximately May, 2011, Dr. Adler moved into the newly constructed house built on Lot 20 by Robinson.

29. In August, 2011, Dr. Adler hired an individual landscaper to provide landscaping services to his Lot.

30. After completing some grading, preparation for tree planting, weeding, purchasing some trees and shrubs, and purchasing some landscaping rocks, gravel and other materials for the Lot, the landscaper and his helper discovered that cracks had begun to appear in the brick veneer of the home constructed for Dr. Adler and in various other places, including the concrete block foundation.

31. On or about August 15, 2011, the landscaper informed Dr. Adler of the existence of cracks in some of the brick veneer of the home and in certain foundation blocks of his home.

32. Prior to on or about August 15, 2011, Dr. Adler did not know, nor could he have reasonably known, of the existence of cracks in the brick veneer or foundation blocks of his home. Likewise, even after being informed of the existence of the cracks, Dr. Adler did not know, nor could he have reasonable known of the reason for the cracks.

33. Upon learning of the cracks in the brick and foundation blocks, Dr. Adler immediately caused the landscaping to halt and sought to obtain the services of a professional engineer to investigate the cause of the cracks in the brick veneer and foundation blocks of his home.

34. Dr. Adler also informed the builder, Robinson, of the existence of cracks in the bricks and foundation blocks, to which Robinson responded by pointing out a sentence in the Construction Contract which he stated absolved him of any liability for not having investigated the site conditions prior to constructing the home.

35. The language of the Construction Contract which Robinson stated absolved him of liability states, "Contractor does not accept responsibility for damages caused by existing site conditions. Geotechnical services and reports have not been provided for the site and therefore standard foundation construction procedures will be in keeping with local, count (sic), and state regulations." See Exhibit B.

36. Based upon information and belief, at the time Dr. Adler's home was built, Robinson poured extra concrete and added extra rebars to the concrete footer and foundation, indications that Ricky Robinson was aware of potential site problems.

37. The cracks in the brick veneer and foundation blocks that Dr. Adler discovered in August, 2011 have worsened over time and the house no longer sits level. Dr. Adler's house has sunk considerably, in excess of state allowed limits. In addition, the seals of several windows have broken with the sinking of the foundation and have discolored, ruining the seals and the windows.

38. After he discovered cracks in the brick veneer and foundation blocks of his home, Dr. Adler conducted research and learned that his home was built on approximately

30 feet of fill material consisting of dirt, boulders and rotten trees, which is not an engineered or controlled fill suitable for residential housing or any structures. The fill was not compacted every 3 to 5 feet, as required by the state building codes and regulations.

39. Upon information and belief, as well as personal knowledge, several of the houses constructed in the Meadow Subdivision have also suffered movement and cracks in the masonry and other structures.

40. After Dr. Adler's home was completed and began developing problems, including cracking of the bricks and blocks, Dr. Adler located a pamphlet distributed by the Department of Abandoned Mine Lands ("AML") which specifically describes the problems that are often encountered when building residences upon former surface mined sites.

41. At no time was any pamphlet similar to that provided by AML provided to Dr. Adler by Elk Glenn or Robinson.

42. Upon information and belief, the septic system installed by Robinson during construction of Dr. Adler's home is located in inappropriate fill material.

43. In approximately September, 2011, Dr. Adler hired a geotechnical engineering firm to investigate the likely cause of the movement of his house and the cracking of bricks and foundation blocks.

44. On October 4, 2011, the engineering firm hired by Dr. Adler issued its report (the "Engineer's Report"), which determined that the house had undergone foundation movement and that the risk of future foundation movement was heightened.

45. The Engineer's Report stated that the fill material used was likely less than 30 to 40 feet in thickness and was most likely placed in a loose and uncontrolled manner. The Engineer's Report concluded that in the engineer's experience, the movement of the foundation could last for several more year and move several more inches, resulting in greater damage.

46. The Engineer's Report also indicated that the slope itself could move, presenting even greater danger to the stability of the home.

47. The Engineer's Report discussed a possible repair, consisting of installing deep foundation supports consisting of pier/piles with grouting injected to the bottom of the piers/piles. However, the Report concluded that if the slope moved more than 2-3 inches, the piers/piles would likely fail.

48. Dr. Adler also caused a home inspection to be conducted by a certified home inspector who issued a report (the "Home Inspection Report") dated May, 2012.

49. The Home Inspection Report confirmed the cracks and evidence of improper settlement observed in the Engineer's Report and in addition determined that the builder had used "unusual foundation construction," causing problems, the indication of which is that the foundation may not be able to support the house's load.

50. The Home Inspection Report also notes the failed thermoseals of the windows resulting from movement of the house, as well as misaligned doors and squeaky and unlevel floors, separation of floors from walls, and cracked separation of ceilings from the walls, all most likely caused by movement of the house.

51. The amount in controversy exceeds $75,000.

52. Dr. Adler is entitled to a jury trial on all issues so triable.

## COUNT I

### (Breach of Contract by Elk Glenn)

Paragraphs 1 through 52 of the Complaint are incorporated by reference herein as if fully set out.

53. Dr. Adler and Elk Glenn entered into a contract, memorialized in a deed to Lot 20 of the Meadow Subdivision, which called for Elk Glenn to sell and Dr. Adler to buy, a Lot suitable for the construction of a residence.

54. Elk Glenn's obligations included conveying the Lot to Dr. Adler suitable for construction of a residential dwelling and suitable for quiet enjoyment of the home to be constructed on the Lot.

55. Elk Glenn breached the contract and deed by conveying the Lot to Dr. Adler which was not suitable for the construction of a residence and as a result Elk Glenn violated the covenant of quiet enjoyment which Dr. Adler bargained for in the purchase of the Lot.

56. Dr. Adler is entitled to an award of compensatory damages in an amount deemed sufficient by this Court to compensate him fully for his damages suffered as a result of the breach of the contract and deed by Elk Glenn.

## COUNT II

### (Breach of Contract by Robinson)

Paragraphs 1 through 56 of the Complaint are incorporated by reference herein as if fully set out.

58

57. Dr. Adler and Robinson entered into a contract, either a verbal or written contract, which called for Robinson to construct a home for Dr. Adler on Lot 20 and for Dr. Adler to pay for said construction.

58. Robinson' obligations included building a house in compliance with the state building codes and regulations suitable for habitation by Dr. Adler.

59. Robinson breached the Construction Contract by building a home which was not suitable for habitation by Dr. Adler due to faulty construction and due to building on a site not suitable for construction of a residential dwelling.

60. Dr. Adler is entitled to an award of compensatory damages in an amount deemed sufficient by this Court to compensate him fully for his damages suffered as a result of the breach of the Construction Contract by Robinson.

## COUNT III

### (Fraud in the Inducement by Elk Glenn)

Paragraphs 1 through 60 of the Complaint are incorporated by reference herein as if fully set out.

61. Elk Glenn induced Dr. Adler to purchase the Lot and to pay $36,000 for the Lot.

62. At the time Elk Glenn induced Dr. Adler to purchase the Lot, authorized representatives of Elk Glenn, including President William Grigsby, knew that Lot 20 of the Meadow Subdivision had been built on a former surface mined site, and knew or should have known that the fill materials used on said site were not "controlled" or "engineered" fills suitable for the construction of residential housing.

63. The authorized representative of Elk Glenn who induced Dr. Adler to purchase the Lot at no time advised Dr. Adler of the known dangers of constructing a home on an

11

Case: 7:12-cv-00085-ART   Doc #: 5   Filed: 08/08/12   Page: 12 of 19 - Page ID#: 52

uncontrolled or non-engineered lot even though they knew, or should have known, of such risks.

64. The facts set forth herein establish that Elk Glenn's authorized representatives fraudulently induced Dr. Adler to purchase the Lot and build a house thereon, which conduct is attributable to Elk Glenn.

65. Dr. Adler is entitled to an award of compensatory damages in an amount deemed sufficient by this Court to compensate him fully for his damages suffered as a result of the fraudulent inducement by Elk Glenn.

66. The actions of the authorized representatives of Elk Glenn in fraudulently inducing Dr. Adler to purchase the Lot and build a house thereon amount to wanton, oppressive, fraudulent, and willful conduct entitling Dr. Adler to an award of punitive damages against Elk Glenn sufficient to punish Elk Glenn for this conduct and to deter such conduct in the future by Elk Glenn and others similarly situated.

## COUNT IV

### (Fraud in the Inducement by Robinson)

Paragraphs 1 through 66 of the Complaint are incorporated by reference herein as if fully set out.

67. Robinson induced Dr. Adler to build a residence on the Lot and to pay $236,250 for construction of the dwelling.

68. At the time Robinson induced Dr. Adler to build his home on the Lot, authorized representatives of Robinson, including Ricky Robinson, knew that Lot 20 of the Meadow Subdivision had been built on a former surface mined site, and knew or

should have known that the fill materials used on said site were not "controlled" or "engineered" fills suitable for the construction of residential housing.

69. The authorized representative of Robinson who induced Dr. Adler to build his home on the Lot at no time advised Dr. Adler of the known dangers of constructing a home on an uncontrolled or non-engineered lot even though they knew, or should have known, of such risks.

70. The facts set forth herein establish that Robinson's authorized representatives fraudulently induced Dr. Adler to build his home on the Lot, which conduct is attributable to Robinson.

71. Dr. Adler is entitled to an award of compensatory damages in an amount deemed sufficient by this Court to compensate him fully for his damages suffered as a result of the fraudulent inducement by Robinson.

72. The actions of the authorized representatives of Robinson in fraudulently inducing Dr. Adler to build his home on the Lot amount to wanton, oppressive, fraudulent, and willful conduct entitling Dr. Adler to an award of punitive damages against Robinson sufficient to punish Robinson for this conduct and to deter such conduct in the future by Robinson and others similarly situated.

## COUNT V

### (Unjust Enrichment by Elk Glenn)

Paragraphs 1 through 72 of the Complaint are incorporated by reference herein as if fully set out.

73. Elk Glenn has been unjustly enriched by receiving money from Dr. Adler, in the approximate amount of $36,000, to which it is not due as a result of its breach of

contract, its committing fraud in the inducement, and for the other violations as set forth herein.

74. Elk Glenn should be ordered to disgorge all proceeds received from Dr. Adler for the purchase of the Lot as a result of this unjust enrichment.

## COUNT VI

### (Unjust Enrichment by Robinson)

Paragraphs 1 through 74 of the Complaint are incorporated by reference herein as if fully set out.

75. Robinson has been unjustly enriched by receiving money from Dr. Adler, in the approximate amount of $236,250, to which it is not due as a result of its breach of contract, its committing fraud in the inducement, and for the other violations as set forth herein.

76. Robinson should be ordered to disgorge all proceeds received from Dr. Adler for the construction of a home on the Lot as a result of this unjust enrichment.

## COUNT VII

### (Negligence and Gross Negligence by Elk Glenn)

Paragraphs 1 through 76 of the Complaint are incorporated by reference herein as if fully set out.

77. As seller of the Lot, Elk Glenn owed a duty to Dr. Adler to divulge to him all of its knowledge and information related to the unsuitability of the Lot for the construction of a dwelling.

62

78. Elk Glenn breached the duty it owed Dr. Adler to divulge to him all of its knowledge and information related to the unsuitability of the Lot for the construction of a dwelling.

79. The breach of the duty by Elk Glenn was the proximate cause of the damages suffered by Dr. Adler in purchasing the Lot and constructing a house on the Lot, which was unsuitable for construction of a dwelling.

80. As a result of the breach of the duty owed to Dr. Adler, and the negligence on the part of Elk Glenn in breaching that duty, Dr. Adler has suffered and is entitled to an award of compensatory damages against Elk Glenn in excess of $75,000.

81. Elk Glenn is guilty of gross negligence in failing to divulge to Dr. Adler the information related to the unsuitability of the Lot for building a dwelling, which conduct amounts to wanton, oppressive, fraudulent, and willful conduct entitling Dr. Adler to an award of punitive damages against Elk Glenn sufficient to punish Elk Glenn for this conduct and to deter such conduct in the future by Elk Glenn and others similarly situated.

## COUNT VIII

### (Negligence and Gross Negligence by Robinson)

Paragraphs 1 through 81 of the Complaint are incorporated by reference herein as if fully set out.

82. As builder on the Lot, Robinson owed a duty to Dr. Adler to divulge to him all of its knowledge and information related to the unsuitability of the Lot for the construction of a dwelling.

83. Robinson breached the duty it owed Dr. Adler to divulge to him all of its knowledge and information related to the unsuitability of the Lot for the construction of a dwelling.

84. The breach of the duty by Robinson was the proximate cause of the damages suffered by Dr. Adler in purchasing the Lot and constructing a house on the Lot, which was unsuitable for construction of a dwelling.

85. As a result of the breach of the duty owed to Dr. Adler, and the negligence on the part of Robinson in breaching that duty, Dr. Adler has suffered and is entitled to an award of compensatory damages against Robinson in excess of $75,000.

86. Robinson is guilty of gross negligence in failing to divulge to Dr. Adler the information related to the unsuitability of the Lot for building a dwelling, which conduct amounts to wanton, oppressive, fraudulent, and willful conduct entitling Dr. Adler to an award of punitive damages against Robinson sufficient to punish Robinson for this conduct and to deter such conduct in the future by Robinson and others similarly situated.

## COUNT IX

### (Violation of Kentucky Residential Building Code)

Paragraphs 1 through 86 of the Complaint are incorporated by reference herein as if fully set out.

87. The Kentucky Residential Building Code (the "KRBC"), adopted by the Kentucky Department of Housing, Buildings, and Construction, as authorized by KRS Chapter 198B, requires that footings shall be built on stable ground.

16

64

88. The KRBC adopts the International Residential Code for One and Two Family Dwellings which states that "footings shall be supported on undisturbed natural soils or engineered fill."

89. Elk Glenn and Robinson violated the KRBC and KRS Chapter 198B by offering for sale and building a dwelling, respectively, on the Lot, which was not stable ground or engineered fill, but rather consisted of uncontrolled placement of overburden from a surface mining operation, which contained large boulders and rotten trees.

90. Elk Glenn and Robinson knew, or should have known, that the Lot consisted of uncontrolled fill not suitable for the construction of a residential dwelling.

91. As a result of the violation of KRBC and KRS Chapter 198B by Elk Glenn and Robinson, Dr. Adler has suffered damages and is entitled to an award of compensatory damages against Elk Glenn and Robinson in excess of $75,000.

92. Elk Glenn and Robinson are guilty of wanton, oppressive, fraudulent, and willful conduct in their violations of the KRBC, entitling Dr. Adler to an award of punitive damages against Elk Glenn and Robinson sufficient to punish these Defendants for this conduct and to deter such conduct in the future by Elk Glenn, Robinson and others similarly situated.

## COUNT X

### (Breach of Implied Warranty of Habitability)

Paragraphs 1 through 92 of the Complaint are incorporated by reference herein as if fully set out.

93. In constructing a residential dwelling on the Lot on a site that was not suitable for such construction, Robinson breached the implied warranty of habitability owed to Dr. Adler.

94. In constructing a residential dwelling on the Lot in a subpar unworkmanlike manner, Robinson breached the implied warranty of habitability owed to Dr. Adler.

95. As a result of the breach of the implied warranty of habitability by Robinson, Dr. Adler has suffered damages and is entitled to an award of compensatory damages against Robinson in excess of $75,000.

96. Robinson is guilty of wanton, oppressive, fraudulent, and willful conduct in its breach of the implied warranty of habitability, entitling Dr. Adler to an award of punitive damages against Robinson sufficient to punish Robinson for this conduct and to deter such conduct in the future by Robinson and others similarly situated.

WHEREFORE, Dr. Adler respectfully prays that this Court:

A. Award him compensatory damages in excess of $75,000 on Counts I – X against Elk Glenn and Robinson, jointly and severally, for the breach of two separate agreements, commission of fraud in the inducement, unjust enrichment, negligence and gross negligence, violations of the provisions of the Kentucky Residential Building Code and KRS Chapter 198B, and breach of the implied warranty of habitability.

B. Award him punitive damages separately against Elk Glenn and Robinson on Counts III, IV, VII, VIII, IX, and X sufficient to punish these Defendants for their conduct and to deter them and others similarly situated from such conduct in the future.

66

C. Award him his costs incurred in prosecuting this action, including a reasonable

attorney's fee, pursuant to KRS 198B.130(1).

D. Award him any and all other relief to which he may appear entitled.

E. Schedule this case for jury trial on all issues so triable.

Respectfully submitted,

/s/ Joe F. Childers
JOE F. CHILDERS

JOE F. CHILDERS & ASSOCIATES
The Lexington Building
201 West Short Street
Suite 300
Lexington, Kentucky 40507
Telephone: (859) 253-9824
Facsimile:  (859) 258-9288
Email: joe@jchilderslaw.com

# Deed

Doc ID: 000011290003 Type: DEED
Recorded: 12/07/2010 at 11:32:39 AM
Receipt#: 2010-00000605
Page 1 of 3
Fees: $17.00 Tax: $36.00
Knott County, KY
Ken Gayheart Clerk of Court
BK 255 PG 636-638

## DEED OF CONVEYANCE

THIS DEED OF CONVEYANCE, made and entered into on this the 30ᵗʰ day of November, 2010, by and between Elk Glen, LLC, a Kentucky limited liability corporation, of P. O. Box 1722, Hindman, Kentucky 41822, (hereinafter referred to as party of the first part) and Richard C. Adler, of P. O. Box 712, Hyden, Kentucky 41749, (hereinafter referred to as party of the second part). The in-care of tax address for the current tax year is Richard C. Adler, P. O. Box 712, Hyden, Kentucky 41749.

WITNESSETH:

THAT for and in consideration of $36,000.00, cash in hand paid, the receipt and sufficiency of which is hereby acknowledged, the party of the first part does hereby sell, transfer and convey unto the party of the second part, his heirs and assigns forever, in fee simple, the following described property, to-wit:

A certain tract or parcel of land located in The Meadow subdivision in Knott County, Kentucky, and being more particularly described as follows:

Lot No. 20 in The Meadow subdivision as set forth in that plat recorded in Plat Book 3, Page 69, of the Knott County Clerk's Office, to which reference is hereby made for a more particular description.

This property is subject to the covenants and restrictions of The Meadow subdivision as set forth in that Declaration of Covenants and Restrictions Affecting The Meadow, dated November 1, 2007, recorded in Deed Book 239, Page 45, Knott County Clerk's Office. This property is also subject to all those easements and right-of-ways set forth on the plat of The Meadow subdivision recorded in Plat Book 3, Page 69, Knott County Clerk's Office.

Being a part of the same property conveyed from Earl M. Cornett, et al to Elk Glen, LLC, dated July 28, 2005, recorded in Deed Book 226, Page 372, Knott County Clerk's Office.

TO HAVE AND TO HOLD the hereinabove described property, together with all appurtenances thereunto belonging unto the party of the second part, his heirs and assigns forever, in fee simple and with covenant of General Warranty.

We, Elk Glen, LLC, party of the first part and Richard C. Adler, party of the second part, do hereby certify and swear, pursuant to KRS Chapter 382, that the full and complete consideration paid for the transfer and purchase of the hereinabove described property was $36,000.00.

IN TESTIMONY WHEREOF, the party of the first part and the party of the second part have hereunto subscribed their names on the date and year first above written.

ELK GLEN, LLC

By _William K. Grigsby_
WILLIAM K. GRIGSBY, MEMBER

_Richard C. Adler_
RICHARD C. ADLER

COMMONWEALTH OF KENTUCKY)
COUNTY OF _Knott_ )

The foregoing deed and consideration certificate was produced, acknowledged, subscribed and sworn to before me on this the 30th day of _November_, 2010, by William K. Grigsby, member of Elk Glen, LLC, a Kentucky limited liability corporation, on behalf of said limited liability corporation.

My commission expires: _OCT. 22-2013_

_Dennis Shepherd_
NOTARY PUBLIC

COMMONWEALTH OF KENTUCKY)

COUNTY OF _Knott_ )

The foregoing consideration certificate was subscribed and sworn to before me on this the _30_ th

day of _November_ , 2010, by Richard C. Adler.

My commission expires: _OCT. 22-2013_ .

_[signature]_
NOTARY PUBLIC

THIS DEED PREPARED BY:

COMBS, ISAAC & CASTLE, PLLC
199 North Lake Drive, Suite 201
Prestonsburg, Kentucky 41653
(606) 886-2391
(606) 886-2776 fax
ciclaw@bellsouth.net

_[signature]_
GREGORY A. ISAAC
Attorney at Law

(Deed prepared without benefit of title search.)

COMMONWEALTH OF KENTUCKY )

COUNTY OF KNOTT )

I, _Ken Gayheart_ , clerk of the county court in and for the county and commonwealth aforesaid, certify that the foregoing deed was on the _07_ day of _Dec_ , 2010, at _____ o'clock _A_ .m. lodged for record whereupon the same with the foregoing and this certificate has been duly recorded in my office in Deed Book _257_, Page _____ . Witness my hand this _07_ day of _Dec_ , 2010.

KNOTT COUNTY COURT CLERK

BY: _[signature]_ D.C.

With $_36.00_ tax paid on same.

R Adler deed (jc#33)



Lot 20

Approximate Top of Slope

Garage

Porch

Porch

# Appraiser's Qualifications

*KENTUCKY FIELD SERVICE REALTY, INC.*
P.O. Box 921 Hyden KY 41749
Ph: 606-672-3856
Email: kfsr@tds.net

## QUALIFICATIONS OF APPRAISER/BROKER, VANCE MOSLEY

### EDUCATION:

- University of Kentucky Forestry and Wood Technician School, 1965.
- Real Estate Appraisal I, University of Virginia, 1970.
- Certified timber marker and tree measurement, US Forest Service, 1971, DBNF, Winchester KY
- Real Estate Appraisal III, Rural Appraisal AIREA, Charlottesville, VA.
- Bachelor of General Studies with Real Estate Certification; includes Real Estate Appraisal Principles, Finance, Law, and House Construction. University of Nebraska at Omaha, 1975.
- Right of Way negotiations, International R/W Association, 1976.
- Income Property Appraising 201, Society of Real Estate Appraisers, EKU, Richmond, KY.
- Appraisal Report Writing, Society of Real Estate Appraisers, Knoxville, TN, 1977.
- Photogrammetry, Remote Sensing, and Ecology, University of Kentucky, 1984.
- International Right of Way Association – Legal Aspects (Title Abstracts), Louisville, KY, 1987.
- WEG-155, Principles of Farm Appraisals/Income Approach, Bowling Green KY, 1991.
- Completed course in home construction and environmental issues, WV, May 1993.
- Completed 11 hours training with Appraisal Institute (Americans with Disabilities Act, Appraisal Practices for Litigation), Louisville, KY 1995.
- Completed 8 hours on Minerals Appraisal Seminar for American Society of Farm Managers and Rural Appraisers on February 26-27, 1997.
- Completed course in Appraising Agricultural Chattels, February 27, 2003, Lexington, KY.
- Completed a course of attendance with the American Society of Farm Managers and Rural Appraisers, (course 6 hours), May 11, 2006, Elizabethtown, KY.
- Completed course "KREAB Day With the Board", March 10, 2006 (course 7 hours) Louisville, KY.
- Completed Appraisal Standard for Federal Land Acquisition February 2007. and June 9, 2012
- Appraiser & Associate training course 7 hours. March, 2009
- Administrative Appraisal Review February 2009 ASFMRA, Lexington KY.

### EXPERIENCE:

- Scaled logs, Georgia Pacific Corporation, scaling 7MMBF, 1965, Evarts, KY>
- March 1968 to February 1986 – US Government – Appraising, negotiation, timber estimation, R/W acquisitions, military leasing, land acquisitions, condemnation and review appraiser; also supervised other appraiser and surveyors in office.
- Met XZ-118 Civil Service qualifications for professional forester, GS-12, 1985.
- Qualified expert witness, Clay County Circuit Court, 1986, and Harlan County Circuit Court, February 1987; Residential Property. Federal Court; London, KY Case #88-294, Case #89-271.
- Appraised residential, income and timberland properties, US Park Service, 1987 to 1998 in New River at Oak hill WV.
- Approved HUD< VA FHA appraiser, Louisville, KY, 1987.
- Appraised 12,000 acres Fee Land (Coal Lands) in New River Gorge in September 1987, using Before and After Method, for US Park Service, Oak hill WV.
- Approved numerous parcels of land for Kentucky Transportation Cabinet, Frankfort KY – 1987 to present.
- Appraised large coal and timber property for James River Coal in May 2002 – Leslie, Clay, and Perry counties. Contract appraiser for State of Kentucky Facilities Management Statewide from 1990 to present.
- Broker – Appraiser April 1, 1986 to present. Kentucky Field Service Realty, Inc., P.O. Box 921, Hyden, KY 41749; and Timberland Appraisals, established April 1, 2004
- Appraised properties, using Before and After Method for James S. Green, Atty, Hyden KY; and Hollen & Hollen, Atty's, Hazard, KY
- Appraised 17,000 acres of Coal Only Property in Nicholas, Green briar and Webster counties, WV, July 1989, for Trust for Public Lands.
- Contract Appraiser for US Forest Service from 1986 to present.
- Appraised property for Harlan County Independent Schools, Harlan KY. Commonwealth of KY, 34th Judicial Circuit Court, Whitley County Court. Timber Trespass KRS 364.130. Boyd Litrell, et al. VS Luther Tucker, et al.
- Completed appraisal of 853 acres on the Alligator River National Wildlife Refuge, Hyde County NC for the U.S. DOI including timber cruise July 2010
- Completed 50 commercial and residential properties for the Pillarsdorph Law firm in Breathitt County 2010-2011
- Completed mass appraisal of 4 funeral homes and 30 residential/commercial parcels for Bianchi Funeral Homes and Real Estate.
- Completed appraisal of 4,250 acres in Crittenden County, KY May 2012 and appraisal of 2,542 acres in Union County, KY respectively using Yellow Book standards for KY Facilities and Support Services 2011.
- Completed appraisal of 600 acres Apollo Fuels property for the U.S. Park Service (DOI) in Tennessee and Kentucky using Yellow Book Standards 2011.

- Completed 16,000 acres "before and after" R/W acquisition ACIN property (Yellow Book) for KY DOT Letcher County KY March 2011.
- Expert witness for Leslie County, KY School Board Vs. CA Lee Estate condemnation in 2012.
- Complete a variety of property appraisals including timberland, recreation, coal properties, timber only, coal only, Right-of-Way easements, commercial and residential appraisals. (Numerous jobs not listed )
- Completed appraisal of 0.75 acre FAA radar site partial acquisition of a 4,000 acres property located on Big Black Mountain
- Job types completed include expert witness, condemnation, partial acquisition, total acquisition., USFLA (Yellowbook), property damage, Mass appraisal, investment and exchange appraisal job types.

## CLIENTS:

U.S. Park Service, U.S Forest Service, U.S. Fish and Wildlife Service, Federal Aviation administration, KY Department of Facilities and Support Services, KY Transportation Cabinet, U.S. Department of Transportation, University of Kentucky, Eastern Kentucky University, Campbellsville University, Natural Lands Trust Fund, the Nature Conservancy, Heritage Commission, International Coal Group, Pine Branch Coal Company, Pocahontas Development Corporation, Forest Land Group, James River Coal Corporation, Pillarsdorph Law Firm, Phillip Lewis Law Firm, Morgan, Madden Brashear & Collins, Wagner Law Firm, Collet Law Firm (numerous clients not listed).

## PROFESSIONAL DESIGNATIONS:

- American Society of Farm Managers and Rural Appraisers-Associate Member. Lexington , KY Chapter.
- Certified General Real Property Appraiser – Kentucky Lic. No. 0832 Expires June 30th, 2013.

75

**Coby Wade Mosley**
Associate Real Property Appraiser/ Consulting Forester
P.O. Box 921, Hyden KY 41749
Office Phone: (606) 672-3856
Cell Phone: (606) 275-9921
Fax: (606) 672-4093

## QUALIFICATIONS OF: COBY WADE MOSLEY
### EDUCATION:

- Graduated from Leslie County High School, May 2007.
- Completed surveying technician 1/Mapping course including a Certificate at Hazard Community and Technical College, 2007.
- Graduated from Hazard Community and Technical College with an Associates in Arts Degree, December 2009.
- Completed Bachelors of Science in Forestry at the University of Kentucky 2007 to 2012.
- Completed Appraisal Institutes 30 hour Basic Appraisal Principals Course, Indianapolis, IN 2008.
- Completed The Appraisal Institutes 30 hour Basic Appraisal Procedures Course Indianapolis IN2008.
- Completed Dennis Badger & Associates 15 hour Basic Income Capitalization A & B course Louisville, KY 2008.
- Completed The Kentucky Real Estate Appraisers Board's 7 hour Supervisor/Associate training course Corbin, KY 2009.
- Completed The Wilson Educational Group 15 hour USPAP course Harrodsburg KY, 2009.
- Completed The Appraisal Institutes "Business Practice and Ethics" 8 hour course December 2009
- Completed The Appraisal Institutes "General Appraiser Sales Comparison Approach" 30 hour course June 2010
- Completed Mckissok's "General Appraiser Market Analysis and Highest and Best Use: 30 hour course July 2011.
- Completed Mckissok's "General Appraiser Site Valuation and Cost Approach: 30 hour course July 2011
- Completed Mckissok's "Expert Witness: 15 hour course May 2012.
- Completed Mckissok's "Real Estate statistics, modeling and finance: 15 hour course October 2012
- Completed The Appraisal Institutes "General Appraiser Report Writing and Case Studies" 30 hour course May 2012
- Completed The Appraisal Institutes "General Appraiser Income Capitalization Approach Part 1" 30 hour course June 2012
- Completed The Appraisal Institutes "General Appraiser Income Capitalization Approach Part 2" 30 hour course October 2012
- Completed The Appraisal Institutes "Uniform Appraisal Standards for Federal Land Acquisitions (Yellowbook)" 16 hour course December 2012

### EXPERIENCE:

- Greenspace Hydro seeding Inc. machine operator, 2005-2006.
- Hoskins & Wolfe Construction Company, Carpenter 2006-2007.
- Paul Hoskins Construction company, Carpenter 2007.
- Worked in sales and inventory at Advance Auto Parts 2007.
- Worked as a Surveying Technician for a Civil Engineer. 2005-2008.
- Kentucky Field Service Realty Inc. Mapping Technician, Deeds and Records Researcher, plotting and calculating timber values, secretary and Associate appraiser training with Residential, Commercial and Timberland Appraisals. 2007 to present.
- Timber marking on 200 acres +/- Short Creek, KY for timber harvest operation May 2010
- Appraised and timber inventory on 853 acres Alligator River National Wildlife Refuge Hyde County NC 2010.
- Mass appraisal of 60 parcels damaged by the flood of May 2009, Breathitt County Kentucky. Numerous
- Appraised a 0.75 acre take of a FAA Radar Site out of a 4,000 acre parcel on Big Black Mountain, Lynch KY June, 2012
- Appraised 170 acres of timber only for Pocahontas Development Co. April, 2012.
- Appraisal of Cardinal Chevrolet automobile dealership Hazard, KY 2011
- Appraised 50 acre Barnes property and 30 acre Dabney property partial acquisition using Yellow Book standards May 2012.
- Appraised 0.75 acre FAA radar site using Yellowbook standards for the Federal Aviation Administration July 2012
- Appraised 120 acre mixed-use timberland/cropland property using land classification analysis Fleming County, KY August 2012
- Appraised 235 acre timberland/agriculture property Nicholas County, Kentucky using Yellowbook standards before and after acquisition Sept. 2012
- Appraised 50 acre commercial/recreation campsite property "Land of Arches" Red River Gorge Wolfe County, KY November 2012
- Appraised 4-unit Multi-family apartment building Jackson, KY January 2013
- Determined diminution in value of commercial mixed used (utility/apartment building) Floyd County, KY January 2013
- Timberland/Recreation Property Appraisal including Timber Appraisals and Inventory (examples if requested)
- Mineral Property Appraisals (examples if requested)
- Commercial/Residential Property Appraisals (examples if requested)
- Kentucky Field Service Realty Inc. Associate appraiser currently holding 4000+ hours' experience 2009 to present.

### DEGREES/CERTIFICATES/DEPLOMAS:

- High School Diploma
- Surveying Technician 1/mapping certificate
- Bachelor of Science Degree in Forestry

### MEMBERSHIPS:

- Associate member of the Appraisal Institute
- Associate member of the American Society of Farm Managers and Rural Appraisers.
- Member of the Society of American Foresters (SAF)

### CERTIFICATIONS:

- Associate Real-estate Appraiser. KY Cert. # 04286
- Surveying Technician 1 Certificate
- Master Loggers Certificate