**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE DIVISION**

**Civil Action No. 12-85-ART**

**RICHARD C. ADLER, M.D.**                                     **PLAINTIFF**

**V.          PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF**
<u>**EXPERT WITNESSES NUNNERY AND GOBLE (DAUBERT MOTION)**</u>

**ELK GLENN, LLC., a Kentucky**
**Limited Liability Company**

**And**

**RICKY ROBINSON CONSTRUCTION, INC., a**
**Kentucky Corporation**                                     **DEFENDANTS**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

In support of his Motion *In Limine* to Exclude Testimony of Expert Witnesses Nunnery and Goble (Daubert Motion), the Plaintiff Richard C. Adler, M.D., by and through counsel, hereby tenders his Memorandum of Law in Support of Motion *In Limine* to Exclude Testimony of Expert Witnesses Nunnery and Goble (Daubert Motion).

<u>**INTRODUCTION**</u>

This is an action brought by the Plaintiff, Richard C. Adler, M.D. ("Dr. Adler") against Elk Glenn, LLC ("Elk Glenn") the developer of the Meadow subdivision in Knott County, Kentucky, and against Ricky Robinson Construction, Inc. ("Robinson") a home builder based in Prestonsburg, Kentucky. In his Complaint, Dr. Adler alleges five causes of action against Elk Glenn and Robinson, including claims for breach of contract, fraud in the inducement, unjust enrichment, negligence and gross negligence, and violation of the Kentucky Residential Building

1

Code. In addition, Dr. Adler alleges a claim against Robinson for violation of the warranty of habitability. By virtue of the Court's Minute Order (Doc. 53), the claim against Elk Glenn for violation of the Kentucky Residential Building Code was dismissed.

This motion is brought pursuant to Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) and Kumho Tire Company v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999) to exclude the testimony of two of the expert witnesses who propose to testify on behalf of Elk Glenn, Dixon Nunnery ("Nunnery"), a real estate appraiser, and James Goble ("Goble"), a home builder. In Kumho Tire, the Supreme Court reiterated the central holding of Daubert that the Court must serve a "gatekeeping" role as to any proffered expert testimony, including technical in addition to scientific testimony. In doing so, trial courts have broad latitude to consider the specific factors set forth in Daubert or to choose not to do so based on the specific facts of each case. Kumho Tire, 119 S. Ct. at 1174-6. While the Daubert factors may be helpful, they are not mandatory. Id.

This Court should review the proposed expert testimony to insure that it is both relevant and reliable. A district court's decision to admit or exclude an expert witness is reviewed for an abuse of discretion. A district court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. The appellate court will not substitute its own judgment for that of the district court and will reverse an evidentiary decision only where the appellate court is left with a definite and firm conviction that the district court committed a clear error of judgment. Palatka v. Savage Arms, Inc., 2013 U.S. App. LEXIS 16775, 10-12 (6th Cir. 2013).

## STATEMENT OF NEED FOR HEARING

Plaintiff does not request a hearing, nor does Plaintiff believe a hearing is necessary for the Court to decide these motions since the witnesses have been subjected to extensive questioning through depositions. However, if the Court believes a hearing is necessary, Plaintiff will fully cooperate.

## TESTIMONY RELEVANT TO THIS MOTION

In order to fully understand the basis for this Daubert motion, it is necessary to understand the testimony of the geotechnical and civil engineers who have testified by way of deposition. Both Nunnery and Goble testified that they had not read or considered the opinions of the geotechnical and civil engineers at the time they issued their reports, or at the time they gave their depositions. (Nunnery deposition, Doc. 71, pp. 21-23; Goble deposition, Doc. 70, pp. 14, 23). In conducting a real estate appraisal of the value of Dr. Adler's house before the damage and afterward, Nunnery did not consider whether the lot was defective for building a residence or whether the house had settled, or would continue to settle, but simply whether the damage was caused by "structural damages as a result of the foundation and the way that – that it was built on the lot." (Nunnery depos., pp. 21-22). Likewise, Goble, the home builder, testified that his estimate to repair Dr. Adler's house only considered "repair[ing] the bricks, the masonry, go inside the house, and fix the drywall." (Goble depos., p. 33). Goble failed to consider the cost of repairs necessary to mitigate the unsuitability of the site, probably because he had absolutely no experience in such mitigation techniques or building on mine spoil. (Goble depos., p. 25).

**Joseph Cooke Testimony**

Joseph Cooke testified by deposition on behalf of Dr. Adler. Mr. Cooke is a civil engineer who has practiced geotechnical engineering for twenty years. In Kentucky, a civil

engineer attains the status of a geotechnical engineer by experience. (Cooke depos., Doc. 67, pp. 7-8). Elk Glenn's engineer, Kevin Howard, explained that he is not a geotechnical engineer but rather a general civil engineer, which he likened to a general medical practitioner as opposed to a heart surgeon (geotechnical engineer). (Howard depos., Doc. 68, pp.11-13). Mr. Cooke has been involved in approximately a dozen residential development projects on reclaimed surface mines in eastern Kentucky and in West Virginia. (Cooke depos., pp. 8-9, 12). In every case where Mr. Cooke's firm recommended building a residence on mine spoil, the recommendation was to either excavate the mine spoil and replace it with "engineered fill" or place the foundation on piers that were anchored into the bedrock underlying the mine spoil. (Cooke depos., p. 13).

In evaluating the site where Dr. Adler's house was built, Mr. Cooke examined the available mine mapping websites, the United States Geological Survey (USGS) maps, available topographic maps, and relied on his twenty years of personal geotechnical experience. Mr. Cooke testified that he had "seen so many problems on mine spoil sites that it is expected in these conditions for uncontrolled fill to continue to cause problems in the future." He continued, "the biggest problem in America with regard to geotechnical conditions is uncontrolled fill." (Cooke depos., p. 34). Mr. Cooke read and referred to a peer study published in a geotechnical manual by Richard Cheeks, a geotechnical engineer, who concluded that settlement problems in mine spoil fills get worse over time. (Cooke depos., pp. 36-37). Mr. Cooke testified that the overwhelming evidence is that uncontrolled mine spoil fills cause a myriad of problems related to settlement. As far as Dr. Adler's house is concerned, Mr. Cooke testified that, in his opinion, the stair step cracking of the brick and mortar that he observed was caused by the foundation moving as a result of the settlement of the mine spoil fill. (Cooke depos., pp. 41-42).

Mr. Cooke explained that the problem with Dr. Adler's house is the site itself, due to the weight of the fill. Every fill that is not engineered is going to settle. (Cooke depos., pp. 52-53, 57). Settlement of fills that are 15 feet or less in depth is not nearly as pronounced as those greater than 15 feet in depth. (Cooke depos., p. 62). He admitted that his initial estimate of the depth of the mine spoil below Dr. Adler's house, 30-40 feet, was low and that the thickness was actually closer to 59 feet as pointed out in another geotechnical report prepared for Dr. Adler's insurance company which Mr. Cooke reviewed and relied upon. Furthermore, he testified that the thicker the mine spoil the higher the risk. (Cooke depos., pp. 97-98). He testified that Lot 20, upon which Dr. Adler's house was built, was unsuitable for conventional residential construction due to settling of the mine spoil which made up the lot.  (Cooke depos., pp. 76-77). There is a high likelihood of future movement of the fill below Dr. Adler's house. (Cooke depos., p. 85).

When asked to explain his opinion that settlement of the ground was the cause of the cracked bricks in the exterior of Dr. Adler's house, Mr. Cooke testified:

> Mine spoil, uncontrolled fill is the number –one . . . cause of foundation structural cracking of projects. I've worked in 15 states and uncontrolled fill, whether it's clay fill, whether it's sandy fill, whether it's mine spoil fill is the number-one cause. And then mine spoil fill is in its category itself just by the sheer nature of the thickness of the fill.

(Cooke depos., p. 90)

He went on to explain that mine spoil fill is usually made up of boulders, cobbles (softball to basketball size rocks) and various amounts of clay and sand size pieces of earth in a various mixture.. He stated that there can often be car-sized boulders in mine spoil. This composition makes it impossible to place the fill in thin lifts in order to properly compact the fill into an engineered fill. This permits water to flow around the boulders in the fill and create voids, which causes erratic settlement. In this situation, cracks first appear in the brick veneer and then later

5

show up in the sheetrock on the interior of the house. This is known as differential settlement. (Cooke depos., pp. 91-92, 97). Mr. Cooke concluded that normally settlement of mine spoil occurs over decades and that unless the residence is repaired by using piers down to bedrock which are tied to the foundation, settlement will likely happen in the future. Even if such repairs are made, there is a substantial risk of horizontal movement due to slope erosion, which would cause the piers to fail. This risk is exacerbated by the fact that Dr. Adler's house is on 59 feet of mine spoil and is only 10-20 feet from the edge of the slope. (Cooke depos., pp. 95-96, 99-100, 104). Houses built toward the middle of the Meadow subdivision are likely sitting on 10 feet of mine spoil and are far less likely to experience the sort of problems that building on deeper fill causes. Mr. Cooke testified that in his experience, when a major project like a subdivision is being planned on a reclaimed mine site, the developer would normally hire his firm or a similar firm to conduct a geotechnical analysis of the site before undertaking construction of the subdivision improvements. (Cooke depos., pp. 107-108, 114 ).

In Mr. Cooke's opinion, the "smoking gun" of causation for the damage to Dr. Adler's house is having been built on uncontrolled mine spoil. He concluded that within a reasonable engineering probability, the building of Dr. Adler's house on 59 feet of mine spoil, which then settled, caused the damage to the house. (Cooke depos., pp. 129-130).

## Kevin Howard Testimony

Kevin Howard has been named as Elk Glenn's engineering expert. Mr. Howard is not a geotechnical engineer, but rather a general civil engineer. His firm, Summit Engineering, frequently contracts with Joseph Cooke and his firm, CSI, for their geotechnical work. Mr. Howard compared civil engineers to general medical practitioners and geotechnical engineers to heart surgeons.  (Howard depos., pp. 11-13). He testified that mine spoil is non-uniform and

6

there is no control over the material. You might find particles ranging from soil-like consistency to boulders the size of pickup trucks in mine spoil. He testified from personal knowledge that on one mine spoil site he was familiar with, a shirt was pulled up from a depth of 15 feet by an auger. (Howard depos., pp. 20, 23).

Mr. Howard testified that on major projects involving mine spoil he would always call in a geotechnical engineer. He considers development of a subdivision of "several acres in extent" to be a major project. (Howard depos., p. 25). He agreed with the study performed by the geotechnical engineering firm hired by Dr. Adler's insurance company, Bowser-Morner, that the mine spoil below Dr. Adler's house was approximately 59 feet deep and Dr. Adler's house sits entirely on that mine spoil. (Howard depos., p. 32). Unlike Mr. Cooke, Mr. Howard did not pull the mine maps for the mine where the Meadow subdivision was built, and admitted that he was unable to refute Mr. Cooke's conclusion that Dr. Adler's house sits on mine spoil that had been dumped over the side of a hill and was therefore prone to differential settlement. (Howard depos., p. 43).

Mr. Howard testified that no one knows how long it takes for unconsolidated mine spoil fill to cease settling, but when asked if he agreed with Mr. Cooke that the settlement typically continues for decades, he said, "It never stops. It goes on and on and on and on and on. But it becomes smaller and smaller and smaller and smaller and smaller and smaller." He testified that as far as he knows, the developers of the Meadow subdivision did not contract with any structural or geotechnical engineers before constructing the subdivision because he was furnished with no such studies prior to submitting his report. (Howard depos., pp. 37-38).

Mr. Howard attached to his report a study from the Virginia Cooperative Extension Service authored by Krebs and Zipper. (Attached to Doc. 42-1, pp. 18-25, Howard report). When

asked if he agreed with the statement in the report that "reclaimed mined lands containing deep fills must be considered to be unstable ground, subject to settlement," he answered by stating that "depending on the definition of 'deep,' yes." However, Howard went on to explain that he interpreted deep as meaning fills of 150 to 200 feet, disagreeing with Mr. Cooke over what constituted unstable ground subject to settlement. (Howard depos., pp. 38-39). Howard agreed, "within reason" with the statement: "from an engineering standpoint, is it a prudent thing for developers to make sure that their sites are buildable before they sell a lot to somebody." (Howard depos., pp. 56-58).

Mr. Howard concluded that in his opinion the "most likely culprit" for causing the cracks in Dr. Adler's house was joint shrinkage due to construction of the house during wet winter months. (Howard depos., pp. 75-76). He testified that he was not aware until the litigation that the state of Kentucky had published a brochure through the Abandoned Mine Lands program warning against building on mine spoil, which stated: "Development on or near mine spoil . . . is highly discouraged. Buildings and septic systems can be damaged as a result of mine spoil settling under the foundation or sliding down slope." (Howard depos., Exh. 1, p. 16).

Mr. Howard agreed that the stair step cracking of the grout in Dr. Adler's home's brick veneer was the same sort of cracking depicted in Figure 2 of the Virginia Soil Conservation study showing settlement cracks in a masonry wall that was subjected to differential settlement. (Doc. 42-1, p. 20, Figure 2; Howard depos., pp. 95-96).

**Gary Ousley Testimony**

Gary Ousley is a geotechnical engineer who testified by deposition on behalf of Robinson. Mr. Ousley described work he had done at the Stonecrest subdivision near Prestonsburg. On that formerly mined site, he encountered problems with mine spoil on many

lots scattered throughout the subdivision. He testified that the depth of the fill at Stonecrest varied from 25 feet to 70 feet. Mr. Ousley testified that he typically advises homeowners to install remedial systems such as foundation piers to bedrock in mine spoil areas and some take his advice and have no problems and others do not and typically have problems. For one homeowner in Stonecrest, Mr. Ousley recommended removal of the mine spoil and replacement with engineered fill. The homeowner followed his advice and has had no problems. (Ousley depos., Doc. 69, pp. 8-10, 14-17, 20-22).

Mr. Ousley testified that the problem with mine spoil fills for building is that they are not controlled fills, rather they are put in for economic reasons and consist of loose, non-compacted materials of varying sizes and composition. He stated that when the mine permit post-mining land use consists of pasture or forest land, there is not a need to engineer the fills; however, if the post-mining land use is for residential  or commercial use much more careful handling of the fill is required.  (Ousley depos., p. 23). Mr. Ousley was asked the following specific question and gave the following answer:

> Q.  If you were going to spend a whole lot of money to develop a subdivision, put in streets, curbs, gutters, lights, underground utilities, would it be prudent to do an investigation of the quality of the sub-surface?
> .  .  .
> A.  Generally, yes.

(Ousley depos., p. 24)

Mr. Ousley also agreed with the statement from the AML publication (Ousley depos., Exh. 1, p. 16) that "Development on or near mine spoil . . . is highly discouraged. (Ousley depos., p. 26). In regard to the Krebs and Zipper report published by the Virginia Cooperative Extension Service, Mr. Ousley disagreed with Mr. Howard and stated that problematic mine spoil fills are any that are over 50 feet in depth. He agreed with the study's conclusion that to develop residential

housing safely in mine spoil requires engineered fill, not uncontrolled mine spoil. (Ousley depos., p. 29).

Mr. Ousley agreed with Mr. Cooke that mine spoil tends to continue to settle for decades, and he agreed with the statement that anyone considering construction on such fill materials should consult a professional engineer with a geotechnical background. (Ousley depos., pp. 31-32). Mr. Ousley concluded that he was not in a position to make an accurate opinion about what caused the cracks in Dr. Adler's house and the theories he offered as possibilities were simply speculation. (Ousley depos., pp. 41-42).

## **ARGUMENT**

### I.    **NUNNERY'S OPINIONS ARE NEITHER RELEVANT NOR RELIABLE AND SHOULD BE EXCLUDED ENTIRELY BECAUSE THEY WILL LIKELY CONFUSE THE JURY.**

The trial judge is the "gatekeeper" of expert evidence and determines its admissibility under Rule 702. As gatekeeper, "the trial judge has discretion in determining whether a proposed  expert's testimony is admissible based on whether the testimony is both relevant and reliable. (citations omitted)." Palatka v. Savage Arms, Inc., 2013 U.S. App. LEXIS 16775, 10-12 (6th Cir. Mich. 2013). When making that determination about a particular expert, the judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Id.

Mr. Nunnery made it clear during his deposition that his appraisal of the "before" and "after" value of Dr. Adler's house and lot was simply based on what the property owner's representative told him during his site visit and what he observed. He never reviewed either

Cooke's report, Howard's report, or Ousley's report before determining his opinion on value. (Nunnery depos., p. 24). In his report (Doc. 42-2, p. 2), under "Alleged Damage Subject Residence," Mr. Nunnery listed "exterior foundation. Foundation settled, interior piers out of level." When asked if those alleged damages had something to do with the way the house was constructed, Mr. Nunnery replied, "That was my understanding, with the interior piers on the foundation, yes." (Nunnery depos., p. 25). He concluded that the "before" value of the house was $280,000 and the "after" value was $270,000, a difference of $10,000. (Nunnery depos., p. 28).

Mr. Nunnery's appraised "after" value did not take into account any potential problems with the site where the house was built. He stated that he "can't speculate on something that . . . might or might not happen in – in the future . . .." However, he did admit that if he was called back in the future and there were additional problems, that might affect his appraisal. In other words, Mr. Nunnery not only totally ignored all of the evidence adduced through the various engineer's reports, he stated that those reports would not have made a difference in his appraised value even if he had been aware of them. He testified, ". . . there's nothing that indicated to me that, right now, that there's anything that would negatively impact the value of this property any more in the market, other than what the property owners purported to me at the time of the inspection."  (Nunnery depos., p. 31, 34).

Mr. Nunnery is also a licensed real estate broker. When asked if as a broker listing Dr. Adler's property for sale he had in his possession engineering reports indicating that the house was built on mine spoil and would likely move in the future, he would have to divulge that information to a prospective buyer, he acknowledged that he would under the seller disclosure law. He admitted that his might affect the value of the property, yet he did not take that into account in doing his "after" appraisal of Dr. Adler's house. (Nunnery depos., pp. 43-44 ).

Mr. Nunnery's testimony is both irrelevant and inherently unreliable. It is irrelevant because he ignored the major "smoking gun" of causation for the cracks that have appeared in Dr. Adler's brick, mortar, and interior sheetrock: settlement due to having been built on mine spoil. He ignored the reality that in marketing the property, Dr. Adler would be forced to inform potential buyers that the house is built entirely on mine spoil and his geotechnical engineer has informed him that the house will likely continue to move for decades, creating additional problems. What buyer in his right mind would pay $270,000 for a house in this condition? It would be like trying to sell a smoking volcano to someone on the basis that it is just smoking now and even though the experts say it will likely emit hot lava a month from now you should buy it based on the fact that it is simply smoking.

This Court must determine whether Mr. Nunnery's testimony "will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592-593 (U.S. 1993). It is clear that the methodology underlying Mr. Nunnery's opinions are not valid since he failed to account for the most obvious cause of the damage to Dr. Adler's house – settlement due to being built on mine spoil. He failed to take into account the likelihood of future movement of the house and how that will affect its marketability. Mr. Nunnery has no engineering training and therefore must rely on the experts as to the suitability of the site. He did not do so, and therefore his testimony is totally unreliable. This testimony simply does not pass the test set forth by the Supreme Court in Daubert, made applicable to non-scientific testimony by Kumho Tire, *supra*. If allowed at trial, this testimony

will undoubtedly confuse the jury and not assist the jury in making the factual determinations that it is called upon to decide.

For these reasons, Dr. Adler respectfully moves the Court to exclude the testimony of Mr. Nunnery from the trial of this case.

I.   **GOBLE'S TESTIMONY SUFFERS FROM THE SAME FATAL FLAWS AS MR. NUNNERY'S AND LIKEWISE MUST BE EXCLUDED FROM THE TRIAL.**

Mr. Goble is a home builder who is prepared to testify on behalf of Elk Glenn about the cost of repairing the damage to Dr. Adler's home. Mr. Goble has 44 years of experience as a homebuilder; however, he has never built a home on mine spoil. (Goble depos., p. 5). He was charged with making a complete inspection of the house for the purpose of determining the cost of repairing the damages alleged to have occurred during or after construction.  (Goble depos., p. 13). Even though he received two engineering reports, one from Bowser Morner and one from Joseph Cooke, prior to completing his repair estimate, he did not read the reports, choosing only to look at the pictures. (Goble depos., pp. 15, 23).

Mr. Goble observed the stair step cracks in the brick and mortar of Dr. Adler's house as well as the interior cracks but stated that he did not know what caused the damage. (Goble depos., pp. 17, 20). He testified that his estimate to repair Dr. Adler's house only considered "repair[ing] the bricks, the masonry, go inside the house, and fix the drywall." (Goble depos., p. 33). Goble did not "see any use" in developing an estimate of what it would cost to secure the foundation of the house to bedrock using piers since he had never built a house on mine spoil, was unfamiliar with the technique and had not read Cooke's report which recommended this as one method to shore up the house. (Goble depos., pp. 24-25). However, he did admit that the most important part of building a house is insuring that it is built on a good, stable site. (Goble

13

depos., pp. 26-27). Mr. Goble's estimate to repair the damage to Dr. Adler's house was $13,091. (Goble depos., p. 32).

Mr. Goble's testimony is unreliable and irrelevant. It not only suffers from the same fatal flaws as Mr. Nunnery's testimony – failing to take into account the likely cause of the damage and the likelihood of future damage to the house, but it is totally irrelevant. The cost of making the cosmetic repairs to the house that Mr. Goble suggested is not relevant to the before and after value of the property, a fact which must be determined by the jury in order to award compensatory damages.

For these reasons, the testimony of Mr. Goble must be excluded from the trial of this case as it is likely to confuse the jury and not assist in the jury's deliberation of the pertinent facts.

Respectfully submitted,

/s/  Joe F. Childers
JOE F. CHILDERS

JOE F. CHILDERS & ASSOCIATES
The Lexington Building
201 West Short Street
Suite 300
Lexington, Kentucky 40507
Telephone: (859) 253-9824
Facsimile:  (859) 258-9288
Email: joe@jchilderslaw.com

## <u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the foregoing Plaintiff's Memorandum of Law in Support of Motion *In Limine* to Exclude Testimony of Expert Witnesses Nunnery and Goble (Daubert Motion) was served via the Court's ECF filing system on this the 23rd day of August, 2013 in accordance with the procedures established by the Court.

/s/  Joe F. Childers
COUNSEL FOR PLAINTIFF