UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| RICHARD C. ADLER, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 12-85-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION &** |
| ELK GLENN, LLC, et al., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| KENTUCKY FARM BUREAU | ) | |
| MUTUAL INSURANCE COMPANY, | ) | |
| | ) | |
| Cross-Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ELK GLENN, LLC, | ) | |
| | ) | |
| Cross-Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

A good expert witness can make all the difference at trial. Drawing on knowledge and experience far beyond that of the average juror, attorney, or judge, expert witnesses serve as guides through thickets of otherwise impenetrable data and bring scientific and technical rigor to judicial proceedings. But not just any person qualifies as an expert witness, and even the most knowledgeable and experienced of witnesses may make mistakes. The Court, as the gatekeeper in judicial proceedings, therefore stands ready to bar the admission of junk science and flawed analysis. In this case, however, the Court need not exercise its

authority, since the expert witnesses retained by the parties have offered admissible testimony under Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**BACKGROUND**

Dr. Richard Adler, a physician, moved to eastern Kentucky in 2009 with the admirable aim of providing medical care to the region's low-income residents. R. 5 at 3. After struggling to find a suitable home, he decided to build one for himself in a new development, the Meadow Subdivision, owned by defendant Elk Glenn, LLC. *Id.* at 4. Like many housing developments in the area, the Meadow Subdivision stands upon flat land reclaimed from a surface mining operation in the 1990s. *See id.* Adler and Elk Glenn negotiated a deal in 2010 for Lot 20, a parcel of land in the subdivision, and later that year Adler contracted with defendant Ricky Robinson Construction, Inc. ("Ricky Robinson") to build a residence on the lot. *Id.* at 4–5. Adler moved into the house in May 2011. *Id.* at 6. Life moved along until August 2011, when a landscaper working on Adler's property discovered cracks in the house's brick veneer. *Id.* Adler alleges that these cracks have worsened over time, and he points to a host of new problems that have recently appeared. *Id.* at 7. He attributes the damage to the fact that his house is situated on dozens of feet of mine spoil, the material used to fill mine cavities after excavation. *Id.* at 7–8. Mine spoil is prone to a problem called differential settlement, which occurs when the materials beneath a house settle unevenly. In Adler's opinion, as the mine spoil under Lot 20 gradually settles over time, his house will slowly fall apart. *Id.* at 8–9.

Displeased with this prospect, Adler sued Elk Glenn and Ricky Robinson on a variety of contractual and tort grounds. The parties all retained multiple experts, and they moved to

exclude certain of their adversaries' expert witnesses pursuant to Rules 702 and 703 and *Daubert*. R. 74; R. 80; R. 82. For the reasons described below, the Court will deny these motions.

## DISCUSSION

When a party challenges an opponent's expert witness, the Court assumes the role of a gatekeeper to ensure the reliability and relevance of the expert's testimony. *See Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (applying the *Daubert* inquiry to non-scientific testimony). Rule 702 guides the Court through this inquiry. Rule 702 specifies, first, that an expert must be qualified to testify through knowledge, skill, experience, training, or education. Fed. R. Evid. 702. A qualified expert may then testify so long as his opinions will aid the fact finder and are reliable, meaning they stand on sufficient data, reliable methods, and the facts of the case. Fed. R. Evid. 702(a)–(d); *see In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). The Supreme Court in *Daubert* provided a list of factors for trial courts to consider as they evaluate the reliability of scientific testimony. *See In re Scrap Metal*, 527 F.3d at 529. These factors are nonexclusive, however, and a district court has "considerable leeway" in making its determination under Rule 702 and *Daubert. See Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006) (quoting *Kumho Tire Co.*, 526 U.S. at 152). The proponent of the testimony must establish its admissibility by a preponderance of the evidence. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

A hearing to decide these issues is unnecessary in this case. Under normal circumstances, a district court may resolve a *Daubert* motion without holding a hearing. *Nelson*, 243 F.3d at 249. A hearing is required only if the record is inadequate to decide the

motion. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000). In this case, the parties fully briefed the admissibility of the various challenged experts' testimony under *Daubert*. *Cf. Nelson*, 243 F.3d at 249; *Barnette v. Grizzly Processing, LLC*, No. 10-cv-77, 2012 WL 293305, at *2 (E.D. Ky. Jan. 31, 2012). Moreover, the parties agree that their briefs provide sufficient guidance to the Court and have asked the Court to resolve these motions without a hearing. R. 74 at 2; R. 80-2 at 3; R. 82 at 1; R. 86 at 2. The Court concurs that a *Daubert* hearing is unnecessary.

## I. Joseph Cooke's Testimony Is Reliable and Therefore Admissible

Geotechnical engineer Joseph Cooke, hired by Adler as an expert witness, testified in a deposition that the differential settlement of the mine spoil under Lot 20's surface caused damage to Adler's home and that Adler could expect further subsurface movement and damage in the future. R. 67-3 at 2. Both Elk Glenn and Ricky Robinson challenge the reliability of Adler's conclusions. R. 74; R. 82. Because the Court cannot quarrel with Cooke's methodology or the reliability of its application, the Court must deny these motions, with one minor exception.

How did Cooke arrive at his opinion that differential settlement had likely damaged Adler's house and might continue to do so for years? To determine the depth and mineral composition of the mine spoil atop which Adler's house stands, Cooke consulted mine maps and websites, United States Geological Survey maps, topographic maps, excavated material, and rock strata visible in nearby areas. *See* R. 67 at 24, 55–57. He also relied on his extensive experience with mine spoil to figure out the likely distribution of materials within the fill beneath the house. That is, he deemed it probable that the mine spoil under Lot 20's surface comprised a mixture of boulders, cobbles, gravel, sand, and clay. R. 67 at 65.

Bearing this in mind, Cooke considered it likely that the mine spoil on Lot 20 had already started settling and would likely continue that process in the future. R. 67-3 at 2; *see* R. 67 at 83–85. He developed this opinion based on his extensive personal experience with mine spoil and his review of scholarly literature finding that mine spoil settlement worsens over time. R. 67 at 34–38. Finally, on a site visit, Cooke reviewed the actual evidence of damage to Adler's property and determined that the cracks in the brick veneer aligned with differential settlement. R. 67 at 34, 41–42. Cooke decided, based on this evidence, that Lot 20 was unsuitable for residential construction without replacing the mine spoil with engineered fill or taking other drastic measures to build a solid foundation. R. 67-3 at 2.

Neither Elk Glenn nor Ricky Robinson challenges Cooke's qualifications to testify as an expert witness in this case. R. 74 at 6; R. 82 at 2. For good reason: Cooke is amply qualified to offer testimony on geotechnical matters. Educated in civil engineering at the University of Kentucky and licensed as an engineer in Kentucky and other states, Cooke has eighteen years of experience in the forensic analysis of geotechnical issues and geologic-related construction planning and analysis. *See* R. 74-10. His training qualifies him as a geotechnical engineer. R. 67 at 7–8. Moreover, Cooke has worked on many projects involving reclaimed surface mining areas. *Id.* at 8. Accordingly, Cooke has the requisite knowledge, skill, experience, training, and education to testify on these matters. *See* Fed. R. Evid. 702. Similarly, the defendants do not question the relevance of Cooke's testimony, and the Court finds no reason to disagree with their assessment. Cooke explicitly bases his testimony on his specialized knowledge as a geotechnical engineer, and his opinion concerns matters outside the knowledge of the average juror. Thus, his testimony, if admissible, will help the jury determine important facts at issue in this case. *See id.* The real question,

therefore, is whether Cooke's testimony is reliable. *See* R. 74 at 6; R. 82 at 2.

### A. Cooke Relied on "Sufficient Facts or Data" in Forming His Opinion

The defendants first challenge the data Cooke relied on in forming his opinion. They lay three charges at Cooke's door: (1) that he failed to investigate the subsurface of Lot 20; (2) that he did not enter the crawl space underneath Adler's residence; and (3) that he did not conduct surveying work or monitor the cracks in the brick facing over time. Because Cooke has adequately explained his choice of a data set, these objections have no merit.

Elk Glenn and Ricky Robinson's first objection—that Cooke did not perform necessary and readily available tests on Lot 20, *see* R. 74 at 8–9; R. 82 at 10—fails for lack of evidence that these tests were actually necessary to Cooke's analysis. The defendants believe that Cooke should have explored the subsurface, either by drilling or by digging a test pit. *E.g.*, R. 74 at 10. But Cooke appears to have followed the prevailing methods of his profession. The other engineers who evaluated the property did not see fit to conduct this sort of testing. *See, e.g.*, R. 69 at 13–14, 35–36, 45, 50–51. And Cooke described his reliance on maps, aerial imagery, and surrounding rock strata to determine the composition of Lot 20's mine spoil as consistent with a common "line of thinking" in his profession—a point the defendants have not contested. R. 67 at 56; *see Kumho Tire Co*, 526 U.S. at 152 (holding that, when determining the reliability of an expert, courts should look to whether the expert employs the same "rigor" as an "expert in the relevant field"). Moreover, Cooke gave reasonable justifications for his failure to investigate what lies beneath the house. He wished to avoid the property damage that these tests would cause, and he felt able to develop an opinion based on "telltale signs" of differential settlement, which carried great significance for him in light of his twenty years of experience with mine spoil. R. 67 at 33–34, 41–42.

Other criticisms of Cooke's source data are similarly unavailing. The defendants attack Cooke's decision not to enter the crawl space of the Adler residence and investigate the foundation and floor joists. R. 74 at 6, 8–9; R. 82 at 3, 6. But, once again, Cooke offered a convincing explanation for his choice: he felt it would add little to the information he needed to make his assessment. R. 67 at 45–46. That is, without actually witnessing the construction of the house, he could not opine on whether it had been appropriately constructed. *Id.* He might have been able to identify certain truly egregious construction errors had he entered the crawl space, but the vast majority of what mattered was hidden from sight. *Id.* While the defendants' experts did investigate the crawl space, they conceded that what they saw there provided no definitive answers. *See, e.g.*, R. 68 at 93–94.

Similarly, the defendants complain that Cooke did not conduct surveying work or monitor the cracking in the brick veneer over time. *See, e.g.*, R. 74 at 6. This instance of the pot calling the kettle black is unpersuasive: while the defendants' experts did once use a level to measure the tilt of various surfaces, R. 43-1 at 3, they too did not conduct GPS elevation calculations or detailed monitoring of the property, *e.g.*, R. 69 at 35–36. So, Cooke's decisions as to what data to rely on were not arbitrary, and they were in line with the choices made by the other expert witnesses in this case—suggesting that his data selection matched the conventional practices of his profession. *See Kumho Tire Co*, 526 U.S. at 152.

### B. Cooke's Reliable Application of a Reliable Methodology Produced His Opinion

Having reviewed a suitable assortment of data, Cooke then reliably applied a generally accepted methodology to reach his conclusion. In the first place, Cooke and the other engineering experts all employed substantially identical analyses to reach their varying

7

conclusions. They reviewed maps and aerial photographs to determine the nature of the mine that originally stood where Lot 20 stands today. *E.g.*, R. 42-1 at 2; R. 67 at 54–56; R. 69 at 33–35. They conducted walkthroughs of the lot and residence and documented their visual observations. R. 42-1 at 3; R. 43-1 at 3; R. 67 at 25–27; R. 69 at 50–51. Then they diagnosed the likely cause of the damage to Adler's residence by comparing the pattern of cracking and other evidence to the typical effects of differential settlement, shrinkage, and other maladies. *E.g.*, R. 67 at 34; R. 68 at 73–79; R. 69 at 38–42, 50–52; *see also Kumho Tire Co.*, 526 U.S. at 147 (acknowledging that experts may tie observations to conclusions through the use of general truths derived from specialized experience). This methodological unanimity indicates that Cooke's technique enjoys general acceptance within the civil engineering community. *See Kumho Tire Co.*, 526 U.S. at 150.

Additionally, Cooke's application of this methodology did not lead to a speculative result, as the defendants allege. *See* R. 74 at 9; R. 82 at 10. The Sixth Circuit has cautioned against admitting evidence in which "A suggests by analogy the possibility of B, which might also apply to C, which, if we speculate about D, could eventually trigger E, so perhaps that happened here." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010) (excluding a doctor's testimony as to the cause of his patient's Parkinson's Disease because the doctor failed to cite any non-speculative evidence for his conclusion that manganese exposure caused the patient's symptoms). Here, however, Cooke relied on more substantial evidence. His review of maps, aerial views, and surrounding rock cuts gave him a clear sense of the substance underneath Adler's home. That information, combined with his ample experience with mine spoil and its properties, helped him conclude that the mine spoil would likely settle over time. Finally, Cooke's observation of the type of cracking suffered by

Adler's home convinced him that this possibility of settlement had become reality. He put two and two together and presented an expert assessment of what had happened at Lot 20. Had Cooke offered "sporadic observations" without "any explicit chain of reasoning," his opinion might have qualified as the sort of scientific guesswork that *Daubert* exists to prevent. *Barnette v. Grizzly Processing, LLC*, No. 10-77, 2012 WL 293305, at *3 (E.D. Ky. Jan. 31, 2012). Here, however, Cooke followed an established analytical path to arrive at a reasonable conclusion based on his research, observations, and expertise.

It makes little difference that Cooke did not conclusively rule out other potential causes for the damage observed in Adler's house. *See* R. 74 at 10 (objecting on this ground); R. 82 at 11 (same). The defendants' experts identified several potential causes for the damage, including joint shrinkage or minor foundation settling caused by the weather. R. 42-1 at 3–4; R. 43-1 at 3. But Elk Glenn and Ricky Robinson overstate the certainty with which their experts pointed to other causes and understate the extent to which Cooke considered those causes. Their experts acknowledged the uncertain nature of their diagnoses. *E.g.*, R. 68 at 73; R. 69 at 41–42. And Cooke did consider alternative answers. R. 67 at 72, 127–30. He simply rejected these answers in light of evidence he believed overwhelmingly supported differential settlement as the explanation. *Id.*; *cf. Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (permitting a physician to offer testimony without ruling out alternative causes if he offers a good explanation as to why his conclusions remain reliable). An expert need not know the answer to a scientific or technical question to a certainty. *Daubert*, 509 U.S. at 590. So long as he has reviewed the appropriate data, applied an acceptable method, and forgone wild inferential leaps, the Court must admit his testimony as reliable. Should the defendants disagree with Cooke's conclusions, they may

freely challenge them through vigorous cross-examination and presentation of contrary evidence. *Id.* at 596.

Thus, because Cooke based his opinion on sufficient facts and applied well-accepted principles to his evaluation of Lot 20, the Court finds that a preponderance of the evidence supports the reliability of his testimony.

### C. Cooke May Not Testify About the Septic Tank, but He May Testify About the Slope on Lot 20

Since Cooke's testimony is admissible, the Court must address one additional question: whether Cooke may offer evidence about the location of a septic tank on Adler's property or the maximum slope on which one might safely construct a house. R. 74 at 13. Elk Glenn argues that Adler did not disclose his intention to offer expert testimony on these subjects, so the Court should disallow them at trial. *Id.* Adler concedes the inadmissibility of Cooke's testimony on the septic tank's location, R. 86 at 10, so the Court will grant Elk Glenn's motion with respect to such testimony. However, Adler argues that because his Rule 26 disclosure indicated that Cooke would testify about the slope, the defendants were on notice and cannot complain after failing to depose Cooke on this subject.[1] *Id.* Because Adler's Rule 26 disclosures and Cooke's report, R. 74-9 at 1, address the issue of slope stability, the Court must deny Elk Glenn's motion to exclude related testimony.

## II. Vance Mosely's Testimony Is Reliable and Therefore Admissible

Elk Glenn next seeks to exclude as unreliable the testimony of Vance Mosely, a real estate expert retained by Adler. R. 74 at 13–16. Mosely conducted an appraisal of Adler's

---

[1] The Court lacks access to the plaintiff's Rule 26(a)(2) disclosures. Since Elk Glenn chose not to reply to Cooke's contention, the Court assumes that this accurately reflects the substance of the plaintiff's disclosures.

property and concluded that its value had diminished to $0. R. 74-3 at 2. As grounds for its motion, Elk Glenn argues that Mosely's testimony improperly relies on hearsay evidence in violation of Federal Rule of Evidence 703.[2] R. 74 at 14. While Elk Glenn has correctly identified a flaw in the evidence underwriting Mosely's report, the Court concludes that his report is ultimately consistent with Rule 703.

Rule 703 permits an expert to base his opinion on hearsay evidence only if experts in his particular field would reasonably rely on that kind of evidence when forming an opinion on the subject. Fed. R. Evid. 703. In this case, Mosely's colleague procured information from bank and insurance representatives about the mortgageability and insurability of Adler's property, R. 73 at 12–13, and Mosely incorporated that information into his report, R. 74-3 at 30. Mosely himself testified that he had never before sought or relied on this type of evidence, R. 73 at 12–14, and nothing in the record indicates that other real estate experts would reasonably rely on such evidence, *see* R. 74 at 16. Adler does not seriously contest this conclusion, offering only the conclusory statement that "[p]laintiff disagrees with [Elk Glenn's] conclusion and submits that . . . reliance on the statements made by the banker and insurance agent are of the type that an appraiser would normally rely on." R. 86 at 13. Since Adler offers no evidentiary basis for this position, the balance of the evidence favors the conclusion that Mosely's opinion depends partially on evidence that other experts would not reasonably consider in forming an opinion.

Despite this conclusion, Adler has adequately supported the admissibility of Mosely's opinion. As Adler points out, inadmissible hearsay evidence constituted only a small

---

[2] Elk Glenn initially styles its motion as arising under *Daubert*. R. 74 at 1. However, since its objection to Mosely's opinion turns only on Rule 703, *see id.* at 13–16, the Court will consider only that rule in its analysis.

fraction of the evidence that informed Mosely's opinion. R. 86 at 14. Instead, according to his own testimony, Mosely based his conclusion that Adler's property was worthless on the market effect of disclosing Cooke's report to potential buyers. *Id.* at 13–14 (citing R. 73 at 41–42). That is, Mosely determined that the stigma created by the revelation that the mine spoil on Adler's property might settle significantly over time would render the property impossible to sell. *Id.* at 14 (citing R. 73 at 83); *see also Gulledge v. Tex. Gas Transmission Corp.*, 256 S.W.2d 349, 353 (Ky. Ct. App. 1952) (permitting a witness to consider stigma in calculating an estimate of depreciated value).[3] Because the real basis for Mosely's opinion comports with Rule 703's requirements, the Court cannot reject his opinion outright due to the single chink in its armor that Elk Glenn identifies. *Cf. United States v. Stapleton*, No. 12-11-(1), 2013 WL 3967951, at *7 (E.D. Ky. July 31, 2013) (finding that an expert witness's opinion did not violate Rule 703 because "there is no indication that [he] actually relied on the [impermissible evidence] in forming his opinion"). Instead, the Court simply finds Mosely's testimony admissible to the extent it does not concern his colleague's interview of bank and insurance representatives to determine the mortgageability and insurability of Adler's property.

### III. Dixon Nunnery's Testimony Is Relevant and Reliable, and Therefore Admissible, Under Rule 702

Adler asks the Court to exclude the testimony of Dixon Nunnery, a real estate agent who conducted an appraisal of Adler's house for Elk Glenn. R. 80-2 at 2. Nunnery's report

---

[3] Elk Glenn attempts to address Mosely's reliance on stigma by reference to *Dickens v. Oxy Vinyls, LP*, 631 F. Supp. 2d 859, 867 (W.D. Ky. 2009). But this case is unhelpful for two reasons. First, *Dickens* rejects an expert witness's testimony largely for his lack of qualifications to testify in the first place, *id.*—an argument Elk Glenn does not make here. Second, *Dickens* is factually distinguishable. The purported expert in that case did nearly no investigation of the site he appraised, leaving his appraisal utterly unsubstantiated. *Id.* Mosely, in contrast, prepared a well-reasoned, properly investigated report. *See* R. 74-3.

and deposition testimony state that Adler's house lost only $10,000 in value as a result of the observable damage to Adler's property. Adler believes that Nunnery's report and deposition testimony are both irrelevant and unreliable because Nunnery failed to consider potential problems with the site on which the house stands. *Id.* at 10–13. Specifically, Adler argues that Nunnery ignored the reports prepared by the parties' three civil engineering experts. *Id.* at 11. However, because Nunnery's testimony is relevant to this dispute and reliably applies an accepted methodology, he may offer his testimony at trial.

Despite Adler's contentions, there can be no serious doubt of the relevance of Nunnery's testimony, which sheds light on a matter important to the jury's decision. Relevant testimony "help[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Adler suggests that Nunnery's testimony lacks relevance because he allegedly ignored important factors causing interior and exterior cracking in Adler's home when appraising the home. R. 80-2 at 12. But this goes to the reliability of Nunnery's principles and methods, not the relevance of his expert opinion. *See Powell v. Tosh*, No. 09-cv-121, 2013 WL 900789, at *7 (W.D. Ky. March 8, 2013) (finding an argument couched in terms of relevance that otherwise recapitulates reliability-related arguments unpersuasive). By comparison, Adler describes his own appraisal expert's testimony as "obviously relevant to the damages suffered by the Plaintiff." R. 86 at 15. Adler cannot have his cake and eat it too. Either testimony respecting the appraised value of his home bears on this dispute, or it does not. Because Nunnery's testimony would aid the jury by clarifying the extent of Adler's damages, it passes Rule 702's relevance test.

Nunnery's testimony is also reliable, because he properly applied accepted principles and methods to the facts of this case. In Kentucky, courts measure permanent damage to real

13

estate by the difference in the fair market value of the real estate immediately before and after the injury. *Rockwell Intern. Corp. v. Wilhite*, 143 S.W.3d 604, 607 (Ky. Ct. App. 2003); *see Smith v. Carbide & Chemicals Corp.*, No. 5:97-cv-3, 2009 WL 5184342, at *2 (W.D. Ky. Dec. 22, 2009) (collecting cases). Determining the before-and-after value of real estate is an art, not a science. *See National R.R. Passenger Corp. v. Certain Temporary Easements Above R.R. Right of Way in Providence, R.I.*, 357 F.3d 36, 39 (1st Cir. 2004). One commonly accepted appraisal method involves comparing "the fair market value of 'comparables' on the basis of the sale transactions." *Younglove Constr., LLC v. PSD Development, LLC*, 782 F. Supp. 2d 457, 459 (N.D. Ohio 2011). In other words, an appraiser typically looks at how comparable properties fared on the market in order to estimate the value of the subject property.

This is, in broad strokes, how Nunnery approached the valuation of Adler's property. Nunnery first inspected the property and talked to Adler's female companion. R. 71 at 8, 19. He then researched the real estate market to see how comparable homes in the Meadows Subdivision and elsewhere had performed and formulated an estimate on that basis. *Id.* at 8–9, 20–21; *see* R. 42-2 at 7. Given the common practice of building on mine spoil in Eastern Kentucky and the attendant risks, Nunnery concluded that Lot 20's particular characteristics would not impact the appraisal because the market price for properties in the same development already incorporated the risks of building on mine spoil. R. 71 at 34–35. As a result, Nunnery calculated that Adler's house had lost just $10,000 in value as a result of the cracks and imbalanced piers.

So far, so good. Still, Adler challenges Nunnery's approach. Citing no precedent, Adler baldly asserts that Nunnery's opinion springs from an invalid methodology, because he

failed to consider the suitability of the specific site on which Adler's house sits. R. 80-2 at 12. Adler thinks Nunnery should have reviewed the engineering expert reports and given substantial credence to Cooke's diagnosis of ongoing differential settlement beneath the house. *Id.* In his view, the depth of the mine spoil and the rate of settlement distinguish his home from the nearby houses Nunnery used for his market comparison. But, as Elk Glenn points out, the house's situation on a former surface mine did figure into Nunnery's evaluation—he simply disagreed with Adler about its impact on the appraised value. R. 84 at 4. Moreover, the evidence of mine spoil settlement is not incontrovertible: only one of the three experts fully supports this theory. *Id.* at 3–4. Adler provides no basis for the proposition that a real estate appraiser must consider unverified theories as part of his appraisal. So, the Court cannot exclude Nunnery's testimony as unreliable, when all signs indicate that he followed an established appraisal methodology. *Cf. Younglove*, 782 F. Supp. 2d at 465 (noting that courts must proceed cautiously before excluding expert assessments of value which may prove helpful because most objections go to the weight rather than the admissibility of the testimony).

This is, of course, not to say that Nunnery's appraisal is necessarily correct. Should the jury find that ongoing differential settlement *did* cause the cracks in Adler's house, Nunnery's appraisal may not adequately account for the specific characteristics of the disputed property. But these challenges go to the weight of Nunnery's testimony, not its admissibility. *Cf. Hogan v. United States*, 407 F.3d 778, 782 (6th Cir. 2005) (affirming the conclusion that an appraisal that did not account for a property's particular flaws—which necessitated pricy environmental testing, in this case—was less persuasive than an appraisal that did). And vigorous cross-examination can overcome these defects, if defects they are.

*See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Smith*, 2009 WL 5184342, at *2 (finding the data set chosen for comparison to be "a proper matter for cross-examination"). For these reasons, the Court will deny Adler's motion *in limine* and admit Nunnery's testimony.

IV. **James Goble's Testimony Is Admissible Under Rule 702**

Finally, Adler has moved to exclude as irrelevant and unreliable the testimony of John Goble, an experienced home builder hired by Elk Glenn to estimate the cost of repairing the damage to Adler's property. R. 80-2 at 13–14. First, Adler questions the relevance of testimony concerning "the cost of making cosmetic repairs to the house" to the jury's determination of compensatory damages. *Id.* at 14. Second, he charges that Goble's estimate is unreliable because he "fail[ed] to take into account the likely cause of the damage and the likelihood of future damage to the house." *Id.* Once again, Adler cites no precedent to guide the Court in applying *Daubert*'s general prescription to these particular facts.

A preponderance of the evidence, however, supports the admissibility of Goble's testimony. First, Goble is evidently qualified by substantial experience to opine on the cost of repairing a residential property. *See* R. 42-3 at 78 (describing Goble's thirty years of contracting work and twenty-three years of experience conducting appraisals). Second, there is no reason to suspect that Goble's testimony, based on his specialized construction knowledge, will not help the jury understand the question of compensatory damages in this case. Goble's deposition testimony concerns matters that are unfamiliar to the average juror, and his opinion on how best to repair structural and cosmetic damages and his cost estimate

16

clearly relate to the question of compensatory damages. Finally, the only objection raised to Goble's methodology—his failure to incorporate the most extreme repairs proposed by Cooke into his estimate—is better viewed as a challenge to the weight of Goble's testimony rather than its admissibility. *See* R. 80-2 at 13. Goble did indeed consider the idea that the house had settled over time and might continue to settle, causing further damage. *See* R. 70 at 18–25. Then, Goble proposed what he viewed as the most suitable repairs, based on his extensive experience as a contractor: shoring up the back porch and front corner of the house by installing multiple piers. *Id.* The fact that his proposal differs from that of another expert witness is a point for the jury to consider at trial, not a reason to reject his testimony out of hand. Thus, the Court will deny Adler's motion *in limine* to exclude Goble's testimony.

## CONCLUSION

Accordingly, it is **ORDERED** that:

(1) Elk Glenn's motion to exclude the testimony of Vance Mosely and Joseph Cooke, R. 74, is **GRANTED IN PART AND DENIED IN PART**. Cooke may not testify about the implications of the septic tank's location. Mosely may not testify on matters related to his colleague's interview of banking and insurance representatives.

(2) Ricky Robinson's motion to exclude the testimony of Joseph Cooke, R. 82, is **DENIED**.

(3)     Adler's motion to exclude the testimony of Dixon Nunnery and James Goble,

R. 80, is **DENIED**.

This the 6th day of December, 2013.

Signed By:
*Amul R. Thapar* AT
United States District Judge