UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| RICHARD C. ADLER, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 12-85-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ELK GLENN, LLC, et al., | ) | **& ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| KENTUCKY FARM BUREAU | ) | |
| MUTUAL INSURANCE COMPANY, | ) | |
| | ) | |
| Cross-Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ELK GLENN, LLC, | ) | |
| | ) | |
| Cross-Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

As John Adams once wrote, "Facts are stubborn things; and whatever may be our

wishes, our inclinations, or the dictates of our passion, they cannot alter the state of facts

and evidence."[1]  Adams could well have been describing this case, in which—try as the

parties might—the stubborn facts resist a simple resolution.  Defendants Elk Glenn, LLC

and Ricky Robinson Construction, Inc. ("Ricky Robinson") and cross-claimant Kentucky

Farm Bureau Mutual Insurance Company ("KFBMIC") have all moved for summary

---

[1] *Forester v. Chertoff*, 500 F.3d 920, 932 n.1 (9th Cir. 2007) (Bea, J., dissenting) (citing John Adams,
*Argument in Defense of the Soldiers in the Boston Massacre Trials*, December 1770, *available at*
http://www.quotationspage.com/quote/3235.html).

judgment.  But too many disputed issues of fact remain for the Court to grant them the relief they desire.  For this reason, the Court will grant in part and deny in part the three motions for summary judgment.

## DISCUSSION

The Court's companion Memorandum Opinion and Order on the parties' motions *in limine*, R. 108, summarizes the essential factual background of this dispute.

Three motions for summary judgment are before the Court.  Two—filed by Elk Glenn and Ricky Robinson—seek summary judgment against Dr. Richard C. Adler on his contractual and tort claims.  R. 72; R. 81.  The third, filed by KFBMIC, requests a determination of whether KFBMIC must defend or indemnify Elk Glenn against Adler's claims.  R. 79.

Summary judgment is warranted if the pleadings, discovery and disclosure materials, and affidavits show that there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To prevail, the movant must demonstrate that undisputed evidence forecloses the nonmovant's claims or that the nonmovant cannot support his claims with admissible evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The nonmovant must then respond with evidence showing a genuine factual dispute.  Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Relying on pleadings or "metaphysical doubts" will not forestall summary judgment; instead, the nonmovant must cite the record.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted).  If the nonmovant successfully rebuts the movant's showing, the Court then decides whether a reasonable juror could find for the nonmovant on each of his claims

after drawing all reasonable inferences in his favor.  *See id.*

## I.  Elk Glenn Is Entitled to Summary Judgment on Only Its Breach of Contract Claim

Elk Glenn's motion for summary judgment requests the dismissal of Adler's four claims for:  (1) breach of contract; (2) fraud in the inducement; (3) unjust enrichment; and (4) negligence and gross negligence.  R. 72-1.  For the reasons discussed below, the Court will deny summary judgment on all but the breach of contract claim.

### A.  Kentucky Law Forecloses Adler's Breach of Contract Claim

As his first claim, Adler alleges that Elk Glenn breached the agreement that the parties reached for the sale of Lot 20.  R. 5 at 10.  Specifically, Adler believes that Lot 20's deed obliged Elk Glenn to convey a lot suitable for the construction of a residential dwelling and for the quiet enjoyment of that dwelling.  *Id.*  According to Adler, Lot 20 did not fit the bill.  *Id.*  Under Kentucky law, to prove breach of contract a plaintiff must demonstrate:  (a) the existence of a contract, (b) a breach of one of the contract's terms, and (c) damages flowing from the breach of the contract.  *See Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007).  Elk Glenn points out that it breached no part of the contract, and Adler does not respond with evidence demonstrating a genuine dispute.  Thus, summary judgment is warranted.

Adler's pursuit of his breach of contract claim must end here because no evidence establishes that Elk Glenn breached the contract's general warranty provision, the only

relevant contractual provision.[2]  The deed for Lot 20 explicitly guarantees the "covenant of General Warranty" to Adler upon purchase of the property.  R. 72-2 at 1.  In Kentucky, a "general warranty" encompasses five covenants of warranty:  (1) seisin, (2) right to sell, (3) freedom from encumbrances, (4) quiet enjoyment, and (5) warranty of title.  *Ralston v. Thacker*, 932 S.W.2d 384, 387 (Ky. Ct. App. 1996) (citing *Dortch's Ex'r v. Willoughby*, 113 S.W.2d 832, 832 (Ky. 1937)).  As Elk Glenn points out, Adler's complaint alleges a violation of the covenant of quiet enjoyment.  R. 72-1 at 8–9.  But only disturbances caused by the holder of some paramount title or right to the land can break this covenant.  Jeffrey J. Shampo, 20 Am. Jur. 2d Covenants, Etc. § 104.  That is, eviction or ouster is the necessary predicate for a breach of this covenant.  *Id.*; *cf. Creson v. Scott*, 275 S.W.2d 406, 408 (Ky. 1955) (holding that no breach of the covenant of quiet enjoyment occurred until the tenant's physical ouster from the premises).  Because the record contains no hint of an eviction or ouster, and because Adler pleaded only a breach of the covenant of quiet enjoyment, Elk Glenn has carried its burden of demonstrating that Adler failed to show that admissible evidence supports his breach of contract theory.

Adler appears to oppose this conclusion, but it is unclear on what grounds he bases his opposition.  *See* R. 96-2 at 14 (baldly stating that genuine issues of material fact preclude summary judgment on the breach of contract claim).  Adler might have successfully responded to Elk Glenn's motion in two ways: by challenging Elk Glenn's

---

[2] Apart from Adler's claim that Elk Glenn breached the covenant of quiet enjoyment, Adler also generally alleges a breach of contract on the basis of Elk Glenn's alleged failure to convey a lot suitable for the construction of a dwelling.  R. 5 at 10.  But Adler points to no specific contractual provision that Elk Glenn allegedly breached.  "It is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Harris v. Am. Postal Workers Union*, 198 F.3d 245, at *4 (6th Cir. 1999) (unpublished table opinion).  It is not the Court's role to scour the contract for sections supporting this claim.  Thus, the Court will only consider Adler's argument with respect to the deed's general warranty provision.

argument that it did not breach the deed's covenant of general warranty or by explaining that Elk Glenn actually breached another aspect of the agreement. Instead, Adler inexplicably urges the Court to consider his breach of contract claim concurrently with his fraudulent inducement claim—going so far as to assert that his "breach of contract and fraud in the inducement claims merge, and the claim is based in tort." *Id.* In his view, Elk Glenn's fraudulent inducement to purchase Lot 20 vitiated the agreement between the parties. *Id.* But this tactic actually undermines his breach of contract claim in two respects. First, it suggests that no valid agreement between the parties ever existed—and the existence of a valid agreement is the first element of a breach of contract claim. Second, it effectively writes Adler's breach of contract claim out of his complaint by equating it with a wholly different cause of action.

For these reasons, the Court will grant summary judgment to Elk Glenn on Adler's breach of contract claim.

### B. Elk Glenn Is Not Entitled to Summary Judgment on Adler's Fraud in the Inducement Claim

Adler next claims that Elk Glenn fraudulently induced him to purchase Lot 20, even though its representatives knew or should have known of the lot's unsuitability for residential development. R. 5 at 11–12. Specifically, he states that two Elk Glenn representatives, Jessica Thacker Combs and William Grigsby, assured him that Lot 20 could support the construction of a home. R. 96-2 at 15. To succeed on this claim, Adler must establish six elements: (1) a material representation (2) which is false (3) known to be false or made recklessly (4) made with inducement to be acted upon (5) acted in reliance thereon and (6) causing injury. *PCR Contractors, Inc. v. Daniel*, 354 S.W.3d

610, 613 (Ky. Ct. App. 2011).  Elk Glenn challenges Adler's evidentiary support for two elements:  falsity, and knowledge of falsity or recklessness.  R. 72-1 at 14.  Because genuine issues of material fact remain as to these elements, the Court must deny Elk Glenn's motion for summary judgment on Adler's fraud in the inducement claim.

Falsity:  Elk Glenn maintains that it truthfully represented Lot 20 as stable and appropriate for normal residential construction.  R. 72-1 at 11.  However, the expert testimony in this case creates a genuine dispute of material fact as to Lot 20's suitability for this purpose.

Elk Glenn employs three strategies, none successful, to deny the existence of a material factual dispute.  First, Elk Glenn attempts to debunk the testimony of Joseph Cooke, Adler's expert civil engineering witness, *id.* at 11–14, who stated in a deposition that Lot 20 is inappropriate for residential construction.  *See generally* R. 67; R. 89.  But the Court has already ruled Cooke's testimony admissible under Federal Rule of Evidence 702, R. 108 at 4–10, and any evaluation of Cooke's credibility and persuasiveness is the province of the jury.  Next, Elk Glenn points out that Cooke made several concessions favorable to its position.  R. 72-1 at 11–14.  For example, Cooke acknowledged that he noticed no problem with the subdivision's sidewalks and streets, that he could not comment on the adequacy of the house's construction, and that successful residential developments on reclaimed mine sites do exist in eastern Kentucky.  *Id.*  However, these points of agreement do not erase the existence of a genuine controversy over whether Lot 20 specifically, as opposed to reclaimed mine sites generally, can sustain conventional residential construction.  Cooke's testimony creates a genuine and material factual dispute on that subject.

Finally, Elk Glenn encourages the Court to dismiss Combs's and Grigsby's purported assurances as mere puffery, which occurs when salespeople offer inflated opinions of their wares. *See* R. 72-1 at 14–15. Under Kentucky law, a misrepresentation is actionable under a fraud in the inducement theory only if it relates to a past or present material fact, rather than to an opinion or prediction. *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 248 (6th Cir. 2012) (citing *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009)); *see also Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, No. 12-6021, 2013 WL 4564740, at *4 (6th Cir. Aug. 29, 2013); David J. Leibson, 13 Ky. Prac. Tort L. § 19:1 (2013). With few exceptions, puffery does not amount to an actionable misrepresentation, and a buyer has a duty to exercise ordinary vigilance when confronted by a salesperson's assurances of quality or future benefits. *Republic Bank & Trust*, 683 F.3d at 251.

In this case, however, Combs's and Grigsby's alleged statements relate to a present material fact rather than to an opinion, so the Court need not even reach the sales puffery issue. A hypothetical example offered by the Sixth Circuit in *Republic Bank & Trust* perfectly frames this distinction:

> Perhaps a homeowner whose house crumbled one year after purchase could not maintain an action against a builder who predicted the home would last for a reasonably long time. But surely, he could sue the builder for claiming that the foundation was made of reasonably good cement when, in reality, it was made of sand.

*See id.* at 249. Similarly, Adler would have no case against Elk Glenn for telling Adler that he would reap sizable profits upon resale of Lot 20. Such representations would sound in opinion, not fact. But Elk Glenn's allegedly specific statements about how Adler

could use Lot 20 at the time of sale are no different from the hypothetical builder's averment that he had installed a solid foundation. Both describe features of the subject property that confer value immediately, not just if certain contingencies come to pass. So, Elk Glenn cannot fairly describe its representatives' sales pitches as opinions.

Accordingly, this matter must proceed to trial unless Elk Glenn can demonstrate that undisputed facts in the record foreclose Adler's argument on the next prong of the fraudulent inducement test.

Knowledge or Recklessness: Elk Glenn next asserts that Adler cannot show that Elk Glenn made its representations either with knowledge of their falsity or recklessly. R. 72-1 at 15. However, a genuine issue of material fact remains as to this element. That is, Combs has testified that she knew of cracks in at least two houses in the Meadow Subdivision, including her own. R. 77 at 51–53. Grigsby has also testified to the existence of cracking in his home. R. 78 at 22. Adler contends that this suffices to show that Elk Glenn knew of nascent settlement-related problems in the Meadow Subdivision while simultaneously representing that he could safely build on Lot 20. R. 96-2 at 16. Elk Glenn, of course, disagrees with this interpretation of the events and points to Combs and Grigsby's testimony that they did not personally suspect that their homes were unsafe. *See* R. 103 at 7. Whether Adler has painted an accurate picture of the facts is ultimately a question for the jury, not this Court, to decide.

Additionally, even if this Court could decide based on the undisputed record that Elk Glenn had no knowledge of Lot 20's unsuitability, the record leaves open Adler's argument that Elk Glenn acted recklessly. Kentucky law finds reckless conduct where "the actor has intentionally done an act of an unreasonable character in disregard of a

known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Kirschner ex rel. Kirschner v. Louisville Gas & Elec. Co.*, 743 S.W.2d 840, 843 (Ky. 1988); *see also Hoke v. Cullinan*, 914 S.W.2d 335, 339 (Ky. 1995) (distinguishing recklessness from negligence, with the former consisting of conscious indifference and the latter of a failure to exercise ordinary care). Testimony by the engineering experts indicates that a reasonably prudent developer would have investigated the subsurface of land intended for residential development, usually by hiring a geotechnical engineer. *See* R. 69 at 23–24; *see also* R. 67 at 12–16 (describing several cases in which a developer retained a geotechnical engineer before deciding whether to build a residential subdivision). Elk Glenn, of course, did not do this. Substantial evidence—the agreement of at least two of these experts—also supports Adler's claim that building on mine spoil carries some inherent risk. R. 67 at 41–42; R. 69 at 30–31. The question of whether Elk Glenn knew or should have known of this peril, given the evidence at its disposal, belongs to the jury, not the Court. *Cf. List v. S. Ry. Co.*, 752 S.W.2d 791, 793 (Ky. Ct. App. 1988) (referring the question of whether the alleged tortfeasors knew of the existence of peril to the jury). Finally, the undisputed evidence does not show that the mine spoil under Lot 20 posed so slender a risk that it could not have resulted in harm. Adler has pointed to evidence—expert testimony and government publications—supporting the idea that harm was highly probable. *See* R. 96-2 at 16–17. Elk Glenn has drawn on contradictory evidence, including the existence of other residential housing developments on mine spoil. *See* R. 72-1 at 15–16. So, once again, the Court must deny Elk Glenn's bid for summary judgment on this claim so that a jury

may decide whether the evidentiary balance tips in favor of recklessness.

> **C. Elk Glenn Is Not Entitled to Summary Judgment on Adler's Unjust Enrichment Claim**

Adler's unjust enrichment claim also survives summary judgment because genuine issues of material fact remain as to key elements. As a threshold matter, an aggrieved plaintiff may not bring an unjust enrichment claim when the parties have an explicit contract which has been performed. *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977). Adler, however, successfully circumvents the bar against bringing such claims where a contract exists by alleging that Elk Glenn's fraudulent inducement rendered the contract invalid. R. 5 at 13–14; R. 96-2 at 22; *cf. Ullmann v. May*, 72 N.E.2d 63, 67 (Ohio 1947) (stating that an unjust enrichment claim may proceed despite the existence of an explicit contract if fraud exists). For this reason, the Court must review the merits of his unjust enrichment claim.

An unjust enrichment claim has three elements: (1) a benefit conferred upon the defendant at the plaintiff's expense; (2) a resulting appreciation of the benefit by the defendant; and (3) the inequitable retention of the benefit without payment for its value. *Christian Cnty. Clerk ex rel. Kem v. Mortgage Elec. Registration Sys., Inc.*, 515 F. App'x 451, 459 (6th Cir. 2013); *Collins v. Ky. Lottery Corp.*, 399 S.W.3d 449, 455 (Ky. Ct. App. 2012). In this case, Adler alleges that he paid Elk Glenn a substantial sum for Lot 20, that this sum appreciated in value over time, and that Elk Glenn retained this sum without conveying in exchange a usable property. R. 5 at 13.

In response, Elk Glenn challenges the sufficiency of Adler's evidence for the third element, denying that it unjustly or inequitably retained funds transferred by Adler. R.

72-1 at 17.  As Elk Glenn explains, Adler received a substantially improved property, with roads and other amenities built by Elk Glenn.[3]  *Id.*  But Elk Glenn does not explain how this argument resolves the matter in its favor.  This is not a situation in which Adler, owning a previously unimproved property, accepted Elk Glenn's services to perform improvements without offering repayment.  In such a case, Adler might owe Elk Glenn for its labor and materials.  *Cf. Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) (considering, but ultimately rejecting, an unjust enrichment claim based on property improvements).  Instead, Adler purchased an already improved property and now claims that Elk Glenn deceived him into vastly overpaying for the lot, even taking the various improvements into account.  In short, the mere existence of improvements on the property cannot automatically defeat his claim, so summary judgment is inappropriate.

### D.    Elk Glenn Is Not Entitled to Summary Judgment on Adler's Negligence and Gross Negligence Claims

In response to Adler's final claims for negligence and gross negligence, Elk Glenn points to the doctrine of caveat emptor.  R. 72-1 at 18.  That is, "where no direct representation is made by the vendor concerning definite facts and the purchaser has sufficient opportunity to observe the condition of the premises," *Fannon v. Carden*, 240 S.W.2d 101, 103 (Ky. 1951), caveat emptor exonerates the seller from liability for

---

[3] The only case Elk Glenn cites, *Guarantee Elec. Co. v. Big Rivers Elec. Corp.*, 669 F. Supp. 1371 (W.D. Ky. 1987),  is inapposite.  In that case, a subcontractor sued the owner of a property for unjust enrichment after it furnished materials and labor to improve the property.  *Id.* at 1374.  The subcontractor had performed its labor under a contract with the primary contractor.  *Id.*  The district court denied the subcontractor's claim, finding that it could not recover against the landowner, which had already paid the contractor for improvements upon its property.  *Id.* at 1381.  Moreover, the court held that the subcontractor must exhaust his remedies against the contractor before seeking recovery from the landowner.  *Id.*  The posture of this case is fundamentally different:  Adler is neither a subcontractor seeking payment for services provided under a contract with a third party nor in an analogous position.  So, the Court finds Elk Glenn's exclusive reliance on *Guarantee Electric* unpersuasive.

conditions present on a piece of property at the time of its sale, *Waldridge v. Homeservs. of Ky., Inc.*, 384 S.W.3d 165, 171 (Ky. Ct. App. 2011); *see* Restatement (Second) of Torts § 352. However, fraud on the part of the vendor creates an exception to caveat emptor. *Craig v. Keene*, 32 S.W.3d 90, 91 (Ky. Ct. App. 2000); *Ferguson v. Cussins*, 713 S.W.2d 5, 6 (Ky. Ct. App. 1986). Here, Adler has alleged fraud in the inducement, and the Court has already ruled that his claim must proceed to the trial. *See supra*, Part I.B. If Adler successfully proves fraud at trial, then caveat emptor would not bar his claims against Elk Glenn. *See Fenske v. Oddo*, No. 5:09-CV-44, 2010 WL 3829198, at *5 (W.D. Ky. Sept. 24, 2010) (permitting the plaintiffs to proceed on negligence and other claims after showing that an exception to caveat emptor applied). Therefore, so long as Adler's fraud claims remain unresolved, the Court cannot grant summary judgment on the basis of caveat emptor.

Elk Glenn may still be eligible for summary judgment if the record does not support the merits of Adler's negligence and gross negligence claims, of course. The Court therefore will consider the evidentiary basis for these claims in turn.

Negligence:  Under Kentucky law, a negligence cause of action has four elements: duty, breach, causation, and injury. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88–89 (Ky. 2003). Elk Glenn challenges only the duty and breach elements of Adler's negligence claim. *See* R. 72-1 at 17–19. Because genuine issues of material fact remain as to whether Elk Glenn breached a duty it owed Adler, Elk Glenn's motion for summary judgment fails.

No known published Kentucky case sets forth a standard of care particular to developers, but the Kentucky Supreme Court has prescribed a universal standard of care

for use in negligence cases. This standard requires that all persons exercise ordinary care for the safety of all other persons who might be foreseeably injured by their acts or omissions. *North Hardin Developers, Inc. v. Corkran ex rel. Corkran*, 839 S.W.2d 258, 261 (Ky. 1992). In addition, courts in other states have held that a subdivider of land must "exercise reasonable care to insure that the subdivided lots are suitable for the construction of some type of ordinary, average dwelling house, and he must disclose to his purchaser any condition which he knows or reasonably ought to know makes the subdivided lots unsuitable for such residential building." *Smith v. Frandsen*, 94 P.3d 919, 924 (Utah 2004) (quoting *Loveland v. Orem City Corp.*, 746 P.2d 763, 769 (Utah 1987)); *see also Hack v. Lone Oak Dev., Inc.*, No. 2007-CA-001431-MR (Ky. Ct. App. June 13, 2008) (unpublished opinion) (citing *Smith* approvingly). Moreover, some expert testimony suggests that a reasonably prudent developer would investigate the subsurface of land intended for residential development. *See* R. 69 at 23–24; *see also* R. 67 at 12–16. Elk Glenn, of course, hired engineers to lay out the Meadow Subdivision but did not hire a geotechnical engineer to look below the land's surface. *See* R. 103 at 10. Whether this constituted a breach of Elk Glenn's duty to Adler therefore remains a jury question.

Gross Negligence: Gross negligence requires a finding that Elk Glenn failed to exercise slight care and displayed either "malice or willfulness or such an utter or wanton disregard of the rights of others as from which it may be assumed that the act was malicious or willful." *City of Middlesboro v. Brown*, 63 S.W.3d 179, 181 (Ky. 2001). As in ordinary negligence cases, Kentucky law strongly prefers to leave the determination of whether gross negligence occurred to the jury. *McTavish v. Chesapeake & Ohio R.R. Co.*, 485 F.2d 510, 513 (6th Cir. 1973); *see Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d

382, 385 (Ky. 1985) (emphasizing the importance of permitting juries to decide negligence cases). In this case, that is the appropriate course. Elk Glenn lobs only conclusory statements at Adler: that its representatives' conduct was not willful or malicious; that other developers have built similar settlements; and that Elk Glenn did consult a few engineers. *See* R. 72-1 at 19–20. But this falls short of Elk Glenn's burden when moving for summary judgment: Elk Glenn has not shown the absence of a genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a), (c); *see also Celotex*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion."). And, even if Elk Glenn made some effort to carry its burden under Rule 56(c), Adler points to evidence—particularly Elk Glenn's failure to get a geotechnical engineer's opinion and to review available literature about building on mine spoil—that could support a finding that Elk Glenn's behavior amounts to wanton or reckless disregard for the property of others. R. 96-2 at 21. Because Elk Glenn has failed to meet its burden and Adler has not, the Court must deny summary judgment on this claim.

## II.     Ricky Robinson Is Not Entitled to Summary Judgment

In response to Adler's negligence, fraud in the inducement, and Kentucky Building Code claims against Ricky Robinson for its work building Adler's residence, Ricky Robinson stands on one defense: that a construction agreement between the parties eliminates all liability to Adler. R. 81 at 3. But genuine issues of material fact exist as to the validity of the construction agreement, and Adler is not estopped from bringing his claims. Consequently, the Court must deny summary judgment to Ricky Robinson.

**A.      Genuine Issues of Material Fact Remain as to the Validity of the Construction Agreement**

To determine whether Ricky Robinson's defense has legs, the Court must first decide whether the construction agreement is valid.  The parties hotly contest this predicate fact.  R. 81 at 4.  However, the record leaves open the possibility that a previous oral agreement, not the construction agreement, bound the parties.  Thus, this matter must proceed to trial.

The undisputed facts are these:  Ricky Robinson tendered a bid to Adler, which described the parties' various obligations and provided a price for materials and labor of $236,250.00.  R. 93-4.  Ricky Robinson later sent a second document—the construction agreement—to Adler, which contained largely the same information.  R. 81-1.  Unlike the bid, the construction agreement also provided that the "Contractor does not accept [responsibility] for damages caused by existing site conditioned [sic].  Geotechnical services and reports have not been provided for the site and therefore standard foundation construction procedures will be in keeping with local, count[y], and state regulations." *Id.* at 4.  Only Ricky Robinson signed the construction agreement.  *Id.* at 5.  Adler paid the sum listed in both the bid and the construction agreement, and Ricky Robinson built the house.  R. 81 at 9.

As an initial matter, Adler mistakes Kentucky law when he contends that his missing signature automatically renders the entire construction agreement invalid under the Uniform Commercial Code's statute of frauds.  R. 97-2 at 13–14.  The UCC's statute of frauds, which Kentucky has adopted, requires that any contract for the sale of goods valued at over $500 be reduced to writing and signed by the party against whom

enforcement is sought.  Ky. Rev. Stat. § 355.2-201.  In this case, the parties came to an agreement for both building materials and the construction of the residence.  *See* R. 97-2 at 13.  But goods incorporated into a real estate construction contract are not goods within the meaning of the UCC.  *Wehr Constructors, Inc. v. Steel Fabricators, Inc.*, 769 S.W.2d 51, 54 (Ky. Ct. App. 1988).  Accordingly, the UCC's treatment of unsigned written agreements does not apply in this case.

Moreover, it is certainly *possible* for an unsigned, written contract to bind Adler.  In Kentucky, an enforceable contract need not always bear the signatures of both parties, particularly where one party signs and both parties thereafter behave as if bound by the contract.  *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 837 (Ky. 2013); *see also Carter v. Hall*, 229 S.W. 132, 134 (Ky. 1921) ("A contract which is not required to be in writing, although signed by one of the parties, need not be signed by the other to make it obligatory upon both, if delivered and accepted by the other orally or by the conduct of the other acquiescing therein, as in the instant case.").  Here, Kentucky's general statute of frauds does not apply.  *See* Ky. Rev. Stat. § 371.010 (requiring a signed, written instrument in only nine enumerated circumstances, none of which match the facts of this case).  And no other known statute requires the reduction of Adler and Ricky Robinson's agreement to a signed, written contract.

The question, therefore, becomes whether Adler's conduct evidenced his acceptance of the construction agreement.  And the record reveals no conclusive answer.  Adler does not deny the existence of some agreement between the parties.  *See* R. 97-2 at 15.  He also concedes he paid for the construction of his home by Ricky Robinson on Lot 20.  *Id.* at 6 (not disputing Ricky Robinson's assertion that Adler made all scheduled

payments, R. 81 at 9). This could conceivably suggest that Adler accepted the written construction agreement. *Cf. Energy Home*, 406 S.W.3d at 837 (holding that a non-signatory's request for service under the contract from the signatory indicated her acceptance of the contract).

Still, Adler proposes a viable alternative theory: that he orally accepted Ricky Robinson's written bid to build his residence, thus creating an agreement between the parties. R. 97-2 at 15. The bid contained the same payment terms as the construction agreement. *Compare* R. 93-4 (bid) *with* R. 81-1 (construction agreement). Thus, Adler argues, he made his payments to satisfy his obligation under the oral agreement formed when he accepted Ricky Robinson's written bid—and not as de facto acceptance of the construction agreement later tendered by Ricky Robinson. *See* R. 75 at 61; *cf. Dohrman v. Sullivan*, 220 S.W.2d 973, 975–76 (Ky. 1949) (holding that mutual manifestations of assent that are in themselves sufficient to make a contract may result in the formation of a contract even if the parties contemplate executing a formal instrument). Under this reading of the facts, the construction agreement's liability-waiving provision counted as a contractual modification requiring separate assent. *See Ky. Natural Gas Corp. v. City of Leitchfield ex rel. Its Utility Comm'n*, No. 2008-CA-000789, 2011 WL 4501976, at *5 (Ky. Ct. App. Sept. 30, 2011) (unpublished opinion) ("There being no mutual assent, there could be no modification of the contract . . . ."). Indeed, Adler has testified that he did not notice the construction agreement's additional terms and believed that the construction agreement merely memorialized his oral agreement to comply with the terms of the bid. *See* R. 75 at 61–64. If Adler is correct, and the parties formed an agreement based on Ricky Robinson's bid, then his payments cannot prove the validity of the unsigned

construction agreement, which came later in time. And, since Ricky Robinson elected not to prove Adler's argument wrong in a reply brief, a genuine issue of material fact remains as to the existence and terms of a written agreement between the parties.[4]

### B. Neither Equitable Estoppel Nor Promissory Estoppel Bars Adler's Claim

Resisting this conclusion, Ricky Robinson argues that Adler's implicit promise to abide by the terms of the construction agreement and Ricky Robinson's reasonable reliance on that promise estops Adler from bringing his claims. But Ricky Robinson's promissory and equitable estoppel arguments suffer from the same material factual disputes that plague the breach of contract claim.

<u>Promissory Estoppel:</u> The doctrine of promissory estoppel does not protect Ricky Robinson from Adler's claims, because that doctrine applies only to factual circumstances absent from this case. Kentucky's promissory estoppel doctrine provides that a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 472 (6th Cir. 2011) (internal quotation marks omitted). The Court must consider the reasonableness of the promisee's reliance when deciding whether enforcing a promise will avoid injustice. *Id.*

---

[4] Ricky Robinson also cautions the Court that Adler's argument masks an attempt to sneak impermissible parol evidence into this case. R. 81 at 11. If the Court were certain that the construction agreement bound the parties, then evidence of the bid and oral acceptance would indeed qualify as parol evidence. *See Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 793–95 (W.D. Ky. 2005) (defining parol evidence under Kentucky law as a contemporaneous oral agreement on the same subject matter as a governing written agreement). But, at this stage, Ricky Robinson has not yet established that the construction agreement governs this dispute. So, what Ricky Robinson characterizes as parol evidence is actually evidence essential to determining when the parties formed a valid contract.

Robinson's promissory estoppel argument fails for two reasons. First, the undisputed evidence in the record does not show that Adler made a promise that he reasonably expected to induce action by Ricky Robinson. Ricky Robinson alleges that Adler, by performing as though the construction agreement governed the parties, made a nonverbal promise to abide by that agreement. R. 81 at 13. But, as the Court has already discussed, it is equally plausible that Adler made his payments to satisfy his obligations under the oral agreement formed when he accepted Ricky Robinson's bid. *See supra*, Part II.A. Ricky Robinson has offered no reason for the Court to suppose that Adler's payments signified both performance under the oral agreement *and* an implicit promise to abide by a new condition. Moreover, under these circumstances, Ricky Robinson's reliance on Adler's alleged promise would be unreasonable, which counsels against enforcing the promise.

Additionally, promissory estoppel would allow Ricky Robinson to circumvent a basic rule of contract law, which constitutes additional grounds for rejecting its application in this case. Under the traditional rule, a party may not argue promissory estoppel as a mere alternative to a standard breach of contract claim. *Davis*, 399 F. Supp. 2d at 795–96. Kentucky courts have suggested that promissory estoppel doctrine applies primarily to gratuitous promises rather than to arms-length transactions supported by consideration. *See id.* at 797. For this reason, courts have denied promissory estoppel claims that would undermine contract law's parameters. *See Rivermont Inn, Inc. v. Bass Hotels Resorts, Inc.*, 113 S.W.3d 636, 642 (Ky. Ct. App. 2003) (holding that promissory estoppel could not defeat the statute of frauds); *see also All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999) (declining to apply promissory estoppel where a

written contract governs the relationship between the parties and its application would circumvent the parol evidence rule).  Here, promissory estoppel would sidestep the rule that modifications to contracts require separate assent.  *See Ky. Natural Gas Corp.*, 2011 WL 4501976, at *5.  So, promissory estoppel has no role to play in this case.

Equitable Estoppel:  For similar reasons, the equitable estoppel doctrine also cannot prevent Adler from raising his claims against Ricky Robinson.  An innocent party who has been fraudulently induced to change his position in reliance on an otherwise unenforceable agreement may invoke equitable estoppel.  *Rivermont Inn*, 113 S.W.3d at 643.  The doctrine's elements are:  (1) conduct which amounts to a false representation or concealment of material facts, or conduct calculated to convey the impression that the facts are otherwise than those which the party subsequently attempts to assert; (2) the intention or expectation that such conduct will influence the other party; and (3) actual or constructive knowledge of the real facts.  *Weiand v. Bd. of Trustees of Ky. Retirement Sys.*, 25 S.W.3d 88, 91 (Ky. 2000).  The party claiming estoppel must therefore show that: (1) it lacked knowledge—or access to knowledge—concerning the truth of the facts in question; (2) it relied in good faith upon the conduct or statements of the other party; and (3) acting in reliance, it changed its position or status to its injury, detriment, or prejudice. *Id.*  Here, Ricky Robinson alleges that Adler's silence concerning his intention to reject the liability-waiving term of the construction agreement, coupled with his performance of his obligations under that agreement, justifies equitable estoppel.  R. 81 at 14–15.

Analyzing the first element of the equitable estoppel test, however, Ricky Robinson has not shown that undisputed evidence renders this doctrine applicable in this case.  No one disputes that Adler paid Ricky Robinson and allowed the construction of a

house on Lot 20. But Adler's actions did not obviously amount to a false representation or concealment of material facts. Ricky Robinson has provided no reason to suppose that Adler's payment was anything more nefarious than a good-faith effort to comply with his obligations under the oral agreement binding the parties. Similarly, it is hard to understand how Ricky Robinson lacked knowledge or access to knowledge concerning the truth of the facts in question. Ricky Robinson knew that Adler had not signed and returned the construction agreement—reasonable grounds for suspecting that Adler had not assented to the agreement and its additional term. Had Ricky Robinson valued that additional term as highly as it now claims, it should have followed up with Adler to ensure he signed the construction agreement.

Thus, because the first element of the equitable estoppel test fails, the entire house of cards comes tumbling down, and the Court must find that equitable estoppel does not justify summary judgment.

### C.    Ricky Robinson Is Not Entitled to Summary Judgment on Adler's Fraud in the Inducement Claim

Ricky Robinson also seeks summary judgment on Adler's claim that Ricky Robinson fraudulently induced him to enter into a contract to build a residence on Lot 20. Fraud in the inducement has six elements:  (1) a material representation, (2) which is false, (3) known to be false or made recklessly, (4) made with inducement to be acted upon, (5) acted in reliance thereon, and (6) causing injury. *PCR Contractors*, 354 S.W.3d at 613. Ricky Robinson challenges Adler's evidence for two of these elements:  that Ricky Robinson made a material representation, and that it knew this representation was false or made it recklessly. R. 81 at 15–17. For the same reasons that the Court denied

summary judgment on Adler's fraud in the inducement claim against Elk Glenn, the Court must deny Ricky Robinson the relief it seeks.

Material Representation:  The parties disagree whether Ricky Robinson assured Adler of Lot 20's suitability as a site for residential development.  *See id.* at 16; R. 97-2 at 19.  Both parties support their contentions with testimonial evidence.  In one deposition, Adler says that he received assurances, R. 75 at 93–94; in another deposition, Ricky Robinson's owner denies that this ever occurred, R. 76 at 17.  A jury must decide who is telling the truth.  Thus, summary judgment is inappropriate.

Knowledge or Recklessness:  The same logic that explains why the Court cannot grant summary judgment on Adler's fraud claim against Elk Glenn, *see supra*, Part I.B, applies here.   Under Kentucky law, reckless conduct occurs where "the actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences."  *Kirschner*, 743 S.W.2d at 843; *see also Hoke*, 914 S.W.2d at 339 (distinguishing recklessness from negligence, with the former consisting of conscious indifference and the latter of a failure to exercise ordinary care).  Testimony from the engineering experts suggests that a reasonable person building a residence would investigate the subsurface of the lot designated for that residence and that building on mine spoil carries inherent risks.  R. 67 at 41–42; R. 69 at 30–31.  Ricky Robinson's eponymous owner also testified that he frequently—though not always—takes action to ameliorate the danger of mine spoil when building spec homes.  R. 76 at 19–22.  Moreover, there remains an evidentiary dispute over whether the mine spoil under Lot 20 was highly likely to result in harm.  Adler stakes

his case on expert testimony and government publications that advise against building on mine spoil in light of the significant risks it entails.  *See* R. 97-2 at 20.  Ricky Robinson, in contrast, points to its owner's deposition testimony about successful residential developments on mine spoil.  R. 81 at 16.  Whether the risk posed by Lot 20 was so great as to make it highly probable that harm would follow is therefore a question for the jury, not the Court.  *See List*, 752 S.W.2d at 793.  Thus, the Court must deny Ricky Robinson's bid for summary judgment on this claim.

## III.    KFBMIC Is Entitled to Summary Judgment on Elk Glenn's Claim for Defense and Indemnity

After Adler filed suit, Elk Glenn presented his claims to KFBMIC for coverage under its commercial general liability insurance policy.  R. 79-1 at 2.  KFBMIC now asks the Court to determine whether it owes Elk Glenn any duties, including a duty to provide a continuing defense against Adler's claims and a duty to indemnify Elk Glenn in the event Adler prevails.  *Id.*  Because Adler's claims do not meet the requirements of Elk Glenn's insurance policy, the Court will grant KFBMIC's motion for summary judgment.

The parties agree on the basic legal framework governing insurance coverage disputes.  *See* R. 106 at 1–2.  As an initial matter, the Court must interpret the insurance contract according to the usage of the average man.  *Assoc. Indus. of Ky., Inc. v. U.S. Liability Ins. Group*, 531 F.3d 462, 465 (6th Cir. 2008).  Clear and unambiguous terms receive their ordinary meaning, *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129, 131 (Ky. 1999), and the Court must resolve all uncertainties and ambiguities in favor of the insured, *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279 (Ky. 1991).

In Kentucky, an insurer has two primary duties to the holder of a liability insurance policy. *See* R. 79-4 at 1 (establishing KFBMIC's duty to indemnify and defend). First, the insurer has an obligation to defend the insured against any allegation "which potentially, possibly, or might come within the coverage of the policy." *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001) (internal quotation marks omitted). The Court determines whether the insurer must defend the insured by comparing the allegations in the underlying complaint with the terms of the insurance policy. *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507 (6th Cir. 2003). The merit of the action has no effect on this inquiry. *Brown Found.*, 814 S.W.2d at 279. Second, an insurer must indemnify the insured against a plaintiff's claims, a duty that is narrower than the duty to defend. *Lenning*, 260 F.3d at 581. Thus, if an insurer has no duty to defend, it necessarily has no duty to indemnify. *Nautilus Ins. Co. v. Structure Builders & Riggers Machinery Moving Div., LLC*, 784 F. Supp. 2d 767, 771 (E.D. Ky. 2011).

Under the terms of the policy purchased by Elk Glenn, KFBMIC promised to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage'" and asserted "the right and duty to defend the insured against any 'suit' seeking those damages." R. 79-4 at 1. The policy applies only to property damage caused by an "occurrence" that took place within the coverage territory and during the policy period. *Id.* at 1 (internal quotation marks omitted). The term "property damage" includes "[p]hysical injury to tangible property, including all resulting loss of use of that property," and "[l]oss of use of tangible property that is not physically injured." *Id.* at 14–15. "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 14. The parties agree that

Adler's claims against Elk Glenn satisfy the coverage territory and policy period requirements. R. 79-1 at 7. However, they disagree over whether the damages claimed by Adler constitute "property damage" under the policy and, if so, whether an "occurrence" caused that damage. *Id.*

Breach of Contract: Because Elk Glenn's claim for coverage relies on a misinterpretation of a key term in its insurance policy, KFBMIC will prevail on its motion for summary judgment and need not defend Elk Glenn against Adler's breach of contract claim. Adler's complaint alleges that Elk Glenn breached the deed's terms by conveying a lot unsuitable for the construction of a residential dwelling and for the quiet enjoyment of that dwelling. R. 5 at 10. For the purposes of its claim against KFBMIC, Elk Glenn argues that the "property damage" alleged by Adler—progressive damage to the residence built on Lot 20—is attributable to an "occurrence"—the continuous settlement of the mine spoil underneath the residence. *See* R. 100 at 6. But Elk Glenn misconstrues the meaning of "occurrence" and its application in this case. Regardless of whether Adler claimed property damage within the meaning of the policy, no occurrence caused the alleged property damage.

The Sixth Circuit has held that the term "occurrence" carries an unambiguous meaning in contracts like this. *Westfield Ins. Co.*, 336 F.3d at 507–08 (interpreting a commercial general liability policy with the identical definition of occurrence in light of *Fryman v. Pilot Ins. Co.*, 704 S.W.2d 205 (Ky. 1986)); *accord Cincinnati Ins. Co. v.*

*Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 73–74 (Ky. 2010).[5]  Thus, the Court must follow the ordinary meaning of the words chosen by the insurer and determine whether the circumstances alleged by Adler qualify as an occurrence.  *See id.*

Even read as generously as possible, however, the term "occurrence" does not embrace Adler's breach of contract claim.  *Kentucky Farm Bureau Mutual Insurance Co. v. Blevins*, 268 S.W.3d 368 (Ky. Ct. App. 2008), clarifies why this is the case.  In *Blevins*, the plaintiffs purchased a house from the defendants based in part on disclosures stating that the house had no leaks.  *Id.* at 370.  After the roof sprang a leak, the plaintiffs filed a breach of contract suit, and the defendants turned to KFBMIC for defense and indemnity under their homeowners' insurance policy.  *Id.*  That policy contained a definition of occurrence virtually identical to the one at issue in this case.  *Id.*  Interpreting this language, the Kentucky Court of Appeals held that a purely economic claim—like breach of contract—could not constitute an occurrence.  *Id.* at 374; *accord Lenning*, 260 F.3d at 582.  The breach of contract charged by the plaintiffs involved a false representation about the condition of the house.  *Blevins*, 268 S.W.3d at 375.  That statement did not cause damage to the house; water leakage did.  *Id.* at 376.  Instead, that statement caused the plaintiffs economic harm, because they might not have purchased the house or might have negotiated a lower price had they received accurate information.  *Id.* at 374 n.5.

---

[5] Elk Glenn suggests that *Crossman Communities of N.C., Inc. v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589 (S.C. 2011), proves otherwise.  That case found that the use of the term "occurrence" in an insurance contract was "ambiguous and must be construed in favor of the insured."  *Id.* at 594.  But in light of controlling Sixth Circuit precedent, the Court cannot follow the South Carolina Supreme Court's interpretation of that term.

*Blevins* precisely parallels the facts of this case.[6] Like the *Blevins* plaintiffs, Adler allegedly purchased property based on Elk Glenn's assurances of quality, then filed suit under a breach of contract theory. The house Adler built on Lot 20 suffered damage, just as the *Blevins* plaintiffs' did. But Elk Glenn's alleged assurances did not cause the damage to Adler's residence—mine spoil settlement, or some other cause, did that. In short, just as in *Blevins*, the breach of contract claimed by Adler caused only economic harm and does not qualify as an occurrence under the subject policy. Thus, Adler's breach of contract claim does not relate to property damage caused by an occurrence, and summary judgment is due to KFBMIC.

Fraud in the Inducement: Following the same reasoning, Adler's fraud in the inducement claim also does not seek compensation for property damage caused by an occurrence. That claim alleges that Elk Glenn's representatives fraudulently induced Adler to purchase the lot, despite its unsuitability, and requests compensatory and punitive damages. *See supra*, Part I.B. But whether or not Adler suffered property damage, Elk Glenn's alleged fraud—the cause of his injury—does not qualify as an occurrence. Elk Glenn has pointed to no evidence demonstrating that its alleged assertions about Lot 20 were "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." R. 79-3 at 14. Instead, because fraud in the inducement requires knowledge or recklessness, it inherently does not qualify as accidental, under the ordinary meaning of the term. *See Westfield Ins. Co.*, 336 F.3d at 507–08 (instructing courts to apply the ordinary meaning of "accident" and providing a definition); *Cincinnati*

---

[6] *Blevins* involves a homeowner's insurance policy rather than a commercial general liability policy. But courts have reached similar conclusions in the latter context. *See Nautilus Ins. Co.*, 784 F. Supp. 2d at 772–73.

*Ins. Co.*, 306 S.W.3d at 73–74. Thus, KFBMIC does not owe Elk Glenn a defense or indemnity for Adler's fraud claim.

<u>Unjust Enrichment:</u>  Similarly, Adler's unjust enrichment claim concerns no property damage arising from an occurrence, so the Court must grant KFBMIC summary judgment on this claim. Adler asserts that his transfer of $36,000 in exchange for Lot 20, as a result of Elk Glenn's fraudulent inducement and breach of contract, resulted in Elk Glenn's unjust enrichment. R. 5 at 13–14. But, once again, the events that allegedly precipitated his injury were fraud and breach of contract. For the reasons described above, these do not count as occurrences under the terms of the agreement, and KFBMIC need not defend or indemnify Elk Glenn with respect to this claim.

<u>Negligence and Gross Negligence:</u>  Adler's final claims, for negligence and gross negligence, similarly do not arise from property damage caused by an occurrence, because they stem from events within Elk Glenn's control. "Occurrence," defined in the insurance policy as an "accident," incorporates the concept of fortuity. *Cincinnati Ins. Co.*, 306 S.W.3d at 74. An event is fortuitous if it is unintended and "beyond the power of any human being to bring to pass." *Id.* at 76 (internal quotation marks omitted). In support of his negligence claim, Adler alleges that Elk Glenn failed to investigate the subsurface of Lot 20 and divulge information it possessed relating to the unsuitability of that lot for conventional residential construction. *See supra*, Part I.D. Elk Glenn's actions in this respect were self-evidently within its own control, and therefore Adler's claims do not describe an "occurrence" within the meaning of the policy. For this reason, the Court will grant summary judgment in favor of KFBMIC, which need not defend or indemnify Elk Glenn on Adler's negligence and gross negligence claims.

## CONCLUSION

Accordingly, it is **ORDERED** that:

(1)     Elk Glenn's motion for summary judgment, R. 72, is **GRANTED IN PART AND DENIED IN PART**.

(2)     Ricky Robinson's motion for summary judgment, R. 81, is **DENIED**.

(3)     Kentucky Farm Bureau Mutual Insurance Company's motion for summary judgment, R. 79, is **GRANTED**.

This the 17th day of December, 2013.

Signed By:

*Amul R. Thapar*

United States District Judge